**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James L. HAYS and Weldon J. Hays,
Defendants–Appellants.**

No. 88–1366.

United States Court of Appeals,
Fifth Circuit.

April 25, 1989.

Michael S. Fawer, Herbert V. Larson, Jr., New Orleans, La., for defendants-appellants.

Delonia A. Watson, Terence J. Hart, Joseph Revesz, Asst. U.S. Attys., Marvin Collins, U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before RUBIN, POLITZ, and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge:

Defendants-appellants James L. Hays and Weldon J. Hays appeal their convictions for conspiracy, misapplication of funds and making false entries in the records of a federally insured savings and loan association. Concluding that the district court's admission of unnecessarily cumulative, prejudicial and irrelevant evidence impermissibly affected substantial rights of the defendants, we are constrained to reverse.

## I. FACTS AND PROCEDURAL HISTORY

In 1982, an appellant-defendant in this case, James Hays, became the president of Lancaster First Federal Savings and Loan Association (hereinafter Lancaster) in Lancaster, Texas. Prior to assuming that position, James Hays, a former Texas Savings and Loan bank examiner, had been Lancaster's vice-president and a member of its board. James Hay's son, Weldon Hays, also a former Texas Savings and Loan bank examiner and the other appellant-defendant in this case, likewise was involved in the savings and loan business as an employee at Lancaster and also as president of the Colony Savings and Loan (hereinafter Colony). This appeal arises from the criminal convictions of James and Weldon Hays for improper activities regarding certain loans and deposits involving the Lancaster's funds. What follows is a brief description of the loans and deposits which are relevant to the issues presented by this appeal.

### A. The Loans
#### 1. "Hubbard I"

In early 1982, Francis Allen Clark (hereinafter Clark), a real estate developer, met Paul Jensen (hereinafter Jensen), the president of Mountain West Mortgage Company (hereinafter Mountain West), a mortgage brokerage company. Mountain West did not actually fund mortgages, but rather was in the business of putting together

borrowers and lenders. As a result of Clark's acquaintance with Jensen, Clark tendered to Mountain West a proposal to purchase and develop a 22½ acre tract of land near Lake Ray Hubbard near Dallas. Responding favorably to Clark's proposal, Jensen, through Mountain West, arranged the necessary financing for the venture from Lancaster. Accordingly, Lancaster loaned Clark $1.5 million and the land was purchased on July 22, 1982. In attendance at the closing were Jensen, Clark and James Hays. It was at that time that James Hays first met Clark. Thereafter, Mountain West and Clark formed Lake Ray Hubbard, Ltd., LL, a limited partnership, to pursue development of the Lake Ray Hubbard property.

### 2. "Hubbard II"

In August 1982, Lancaster made another loan, this time for construction on the 22½ acre Lake Ray Hubbard tract which was previously purchased and described above. The proceeds of the Hubbard II loan, also in the amount of $1.5 million, went to another newly formed limited partnership, Lake Ray Hubbard Ltd. I. Lake Ray Hubbard Ltd. I was to provide the necessary construction on the Lake Ray Hubbard property. The partnership distribution of Lake Ray Hubbard Ltd. I was as follows: Clark, a general partner held 45.5% interest; Mountain West, a limited partner held 45.5% interest; James Hays, a limited partner held 4% interest;[1] and Richard Randall, a limited partner held 5% interest.

### 3. "Plano"

Later in 1982, Lancaster loaned Plano Ltd. I, another limited partnership, $3,000,000 for the purchase of a twenty-eight acre tract near Plano, Texas. Plano Ltd. I was structured as follows: Clark, a general partner held 41% interest; First Financial Mortgage Corporation,[2] a limited partner held 41% interest; James Hays, a limited partner held 4% interest; and Richard Randall, a limited partner held 10% interest. Allegedly, this loan was overfunded by approximately $300,000.[3]

### 4. "HLH Joint Venture Loans"

In August 1982, a partnership was formed by Weldon Hays, William O. Henry and Lawrence Moffitt as equal partners. Known as HLH Joint Venture, the partnership was created to purchase and develop land. Allegedly, Weldon Hays had been brought into the partnership by Henry and Moffitt because Weldon Hays had the ability to procure the necessary financing and appraisals through his father, James Hays, who was then president of the Lancaster. The HLH partnership agreement provided that any two of the three partners could sign documents for the partnership.

The loans made by Lancaster to the HLH Joint Venture were as follows: the first loan was for $1,000,000 and was made in August 1982; the second loan was for $840,000 and was made in December 1982; and the third loan was for $380,000 and was made in January 1983. The $1,000,000 loan was allegedly overfunded by $423,016 and the $380,000 loan by $19,782.

Weldon Hays never signed any of the loan agreements, although the other two partners did. According to the Government, the conspicuous absence of Weldon Hays' signature on the loan agreements reflected an intent to conceal his partnership interest in the HLH Joint Venture. Ultimately, the HLH Joint Venture was dissolved and Weldon Hays was paid $245,330 for his interest in the partnership.

### B. *The Deposits*

Some time after Weldon Hays left his position as an examiner with the Texas

---

**1.** It is interesting to note that James Hays' capital contribution to the partnership was $10.00. It is also worth noting that the partnership agreement was not signed until after the closing of the August 1982 loan.

**2.** First Financial Mortgage Corporation had three directors: Paul Jensen, Weldon Hays, and Van Zannis.

**3.** Two other loans made by Lancaster to two other limited partnerships, Lake Meadows, Ltd. I and Lake Meadows, Ltd. II, are not discussed here as both defendants were acquitted of any criminal conduct in connection with those loans.

Savings and Loan Department, he was approached by an individual by the name of Harry Hunsicker (hereinafter Hunsicker). Hunsicker, a real estate appraiser and investor, owned a shopping center in the Colony, a suburban community near Dallas. Seeking a new tenant for his shopping center, Hunsicker convinced Weldon Hays that the Colony needed its own savings and loan association which could be housed in Hunsicker's shopping center. It would be called the Colony Federal Savings and Loan.

After receiving advice from a regulatory consultant, Weldon Hays sought to acquire a provisional charter for his new savings and loan. The requisites for a provisional charter are not particularly cumbersome and are in fact, remarkably simple. First, marketing studies are required. Those studies must reflect that a new savings and loan association is not only needed in the community but that its presence would not have an adverse impact. Next, organizers must pledge $250,000 in deposits as protection against losses by initial depositors until insurance is obtained from the Federal Savings and Loan Insurance Corporation (FSLIC). The organizers' pledges are then attached to an application for a provisional charter to the Federal Home Loan Bank (hereinafter FHLB). Upon approval by the regional FHLB, the application is forwarded to the FHLB Board in Washington where, upon final approval, a provisional charter is issued. After the issue of the provisional charter, the organizers have six months to obtain deposits in the amount of $2,000,000 from 1,000 depositors, seventy-five percent of whom must be from the institution's market area. When the above requirements are met, and the appropriate insurance premiums are paid to the FSLIC, the new savings and loan may engage in a full range of services.

The Colony met the above described initial requirements and was granted a provisional charter. Unfortunately, however, Weldon Hays and the other organizers of the Colony were unable to meet the depository requirements for an unqualified charter. A six month extension was sought and granted. Nevertheless, Colony failed to secure the necessary deposits and the provisional charter expired. It was thereafter surrendered by Weldon Hays on November 4, 1982. Significantly, some $400,000 of Lancaster's funds were deposited in Colony before its demise even though the deposits of Colony had not been, nor ever were, federally insured.

### C. *Wheelers, Dealers or Conspirators?*

The Government charged James and Weldon Hays with illegally receiving pecuniary benefits in connection with the above described loans. Those benefits are as follows: On September 9, 1982, First Financial Mortgage Company (hereinafter First Financial) paid James and Weldon Hays each $15,000 in fees earned by First Financial on the Plano loan. Later, on October 14, 1982, First Financial paid James Hays $12,500 for loan expenses on the Hubbard II loan. Additionally, James and Weldon Hays were paid $44,400 in commissions from First Financial for the HLH Joint Venture loans. On December 30, 1982, Lancaster issued a check that was signed and approved by James Hays in the amount of $22,008 to First Financial. That check was then used to purchase another check in the amount of $22,008 which was payable to Weldon Hays. Despite receiving these benefits, James Hays, on January 11, 1983, signed a "representation letter" in which he failed to disclose his receipt of fees as well as his ownership interest in an entity to which Lancaster had loaned money.

In addition to the above mentioned benefits in connection with the loans made by Lancaster, the government charged Weldon and James Hays with receiving other improper benefits as a result of their savings and loan activities. Namely, in October 1982, $46,000 of Lancaster's funds were used to purchase two Cadillacs which were used by James and Weldon Hays. Moreover, Weldon Hays used his Cadillac before he was employed by Lancaster and the automobile was later purchased by the HLH Joint Venture from Lancaster. Finally, as mentioned previously, Weldon Hays received $245,330 for his interest in the

HLH Joint Venture Partnership upon its dissolution.

On October 28, 1987, a federal grand jury returned an eleven count indictment against James Hays and Weldon Hays. Count 1 of the indictment charged James and Weldon Hays under 18 U.S.C. § 371 with conspiring to violate 18 U.S.C. §§ 657 and 1006. The remaining ten counts charged James Hays with the misapplication of funds belonging to a savings and loan institution, making false entries and the illegal receipt of loan proceeds in violation of 18 U.S.C. §§ 657 and 1006. Weldon Hays was charged with aiding and abetting in all of the above counts with the exception of Count 9.

The defendants entered pleas of not guilty to all counts. A jury trial ensued during which the Government called forty-one witnesses and offered somewhere in the neighborhood of 300 exhibits. Thereafter, the jury found James Hays guilty on all counts of the indictment except for Counts 5 and 6. Weldon Hays was convicted on all counts with which he was charged except for Counts 5 and 6. James Hays was sentenced to five years' imprisonment on both Counts 1 and 2 with the sentences to run consecutively. On each of the remaining counts, James Hays was sentenced to five years' imprisonment with the sentences to run concurrently with each other and the Count 1 sentence. James Hays was fined $60,000. Weldon Hays was sentenced in an identical manner, except that his fine was assessed at $55,000. The defendants thereafter timely appealed.

## II. DISCUSSION

On appeal the appellants contend that the district court made a substantial number of evidentiary rulings that were in error. Specifically, appellants contend that the trial court improperly allowed the Government to introduce an overwhelming amount of irrelevant evidence. They also argue that even if some of the challenged evidence was relevant, that it was highly prejudicial, and as such was improperly admitted under Fed.R.Evid. 403. As a second assignment of error, the appellants maintain that the repeated references to, and extraordinary emphasis that was placed upon, their alleged violations of civil banking regulations was a violation of their constitutional rights to due process of law under the fifth amendment. Because we conclude that the appellants' first point of error has merit and warrants reversal, we do not reach appellants' second point of error.

The appellants argue the district court erred in allowing into evidence some 200 pages of testimony and numerous exhibits which had no bearing on the charges alleged in the indictment. To determine whether the evidence challenged by the appellants was, in fact, irrelevant, recourse must be had to the wording of the indictment. As the appellants correctly contend, under the indictment, the Government needed only to establish the existence of the Hubbard I loan, the Hubbard II loan, the Plano loan, the HLH Joint Venture loans, the representation letter signed by James Hays, and the existence of a conspiratorial relationship between James Hays, Weldon Hays, and Paul Jensen. The appellants urge that had the Government been limited to introducing only the evidence necessary to establish those facts, then the length of the trial would have been reduced substantially and the number of exhibits which were introduced would have been cut by almost one third. More importantly, the appellants contend that the introduction of such irrelevant and prejudicial evidence was reversible error.

As defined by the Federal Rules of Evidence, relevant evidence is that evidence which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Evidence which meets this broad standard is known as "logically relevant" evidence. The Federal Rules of Evidence further provide that "[a]ll relevant evidence is admissible," and that "[e]vidence which is not relevant is not admissible." Fed.R.Evid. 402.

In determining whether evidence should be admitted or excluded on the basis of

relevancy, however, the trial court's decision does not always turn upon a simple determination that the standard enunciated in Rule 401 is satisfied. Instead, the focus may turn to a determination of whether the proferred evidence is "legally relevant." Fed.R.Evid. 403 provides that "[relevant] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Thus, while the trial court's discretion in admitting evidence under Rule 401 is necessarily quite broad, Rule 403 requires a balancing of interests to determine whether logically relevant evidence is also legally relevant evidence.

■ In reviewing the district court's rulings on matters of relevancy, this Court is guided by the principle that district courts have wide discretion in determining relevancy under Rule 401. The district court's decision will not be disturbed absent a substantial abuse of discretion. *United States v. Brown,* 692 F.2d 345, 349 (5th Cir.1982). Similarly, the decision of the district court with regard to the admissibility of evidence under the standards set forth in Rule 403 is subject to considerable deference. In the absence of an abuse of discretion, the district court's ruling on matters involving Rule 403 will not be overruled. *United States v. Kalish,* 690 F.2d 1144, 1155 (5th Cir.1982), *cert. denied,* 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983).

Nevertheless, our review of erroneous evidentiary rulings in criminal trials is necessarily heightened. As the Supreme Court has instructed, evidence in criminal trials must be "strictly relevant to the particular offense charged." *Williams v. New York,* 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949). "The admission of irrelevant facts that have a prejudicial tendency is fatal to a conviction, even though there was sufficient relevant evidence to sustain the verdict." *United States v. Allison,* 474 F.2d 286, 289 (5th Cir.1973) (citing *Williams v. United States,* 168 U.S. 382, 18 S.Ct. 92, 42 L.Ed. 509

(1897)). Thus, when viewing the error alleged, we must examine the consequences of the error in light of the entirety of the proceedings. To that end, we are constrained to take into account "what effect the error had or reasonably may be taken to have had upon the jury's decision." *Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946). While we realize that it is indeed a rare case that is reversed on the basis of erroneous evidentiary rulings under Fed.R. Evid. 401 and 403, we nevertheless emphasize that we are bound to zealously guard against emasculation of the important protections that those rules afford the defendants in criminal cases.

We turn now to the record and the challenged evidence. That evidence may be divided into three categories: 1) evidence which involves the events leading up to the inception of Colony, 2) evidence which concerns the activities of Paul Jensen, and 3) evidence regarding a settlement agreement between the Hays and Lancaster. We first address the evidence which was introduced by the Government concerning Colony.

■ At trial, the Government presented eleven witnesses who testified at length regarding Weldon Hays' allegedly improper activities during the time he was attempting to secure sufficient deposits to ensure the continued operation of Colony. The testimony of those eleven witnesses required almost 200 pages of the record on appeal. Little, if any, of that testimony is relevant to the offenses with which either Weldon Hays or his father were charged. Instead, the evidence consists primarily of testimony regarding the unscrupulous conduct of Weldon Hays at or about the time he was attempting to get Colony chartered.

Specifically the challenged testimony accused Weldon Hays of generating fictitious lists of depositors, forging pledges, receiving a clandestine salary and engaging in other misconduct relative to the formation of *Colony.* We fail to see how these matters relate to the specific offenses charged in the indictment since the charged offenses occurred years later and were in connection with *Lancaster.* According to

the indictment, James and Weldon Hays conspired to misapply Lancaster's funds, not Colony's funds. The indictment alleged conspiracy to make false entries in Lancaster's books, not Colony's books. The indictment alleged misapplication of Lancaster's funds and making false entries in Lancaster's books, not Colony's. Accordingly, the only glimmer of possible relevance of this testimony to the offenses charged is fleeting at best. Thus, we must conclude that its admission was error.

■ A review of the record leaves us with the distinct impression that the Government's motive in introducing such evidence was to attack the character of Weldon and James Hays. As such, the admission of the evidence was also violative of Fed.R.Evid. 404(b). Likewise, a review of the record leaves us with the impression that the evidence was cumulative, unduly prejudicial and inflammatory. Had the evidence been restricted to a limited number of witnesses, or had the testimony taken a more modest number of pages of the record, the result might have been different. However, such was not the case. Under the appropriate standard of review, and on this record, we are unable to conclude that the error had no effect, or only a slight effect on the jury's decision. *Kotteakos*, 328 U.S. 750, 66 S.Ct. 1239. Having so concluded, we must view the error as having impermissibly affected substantial rights of the defendants. *Id.*

■ Next, we focus on the evidence pertaining to Paul Jensen. Although never explicitly recognized as such by the district court, a review of the record in light of the indictment leaves the clear impression that Paul Jensen was one of the "unidentified co-conspirators" named in the indictment. Unlike the Colony evidence, the evidence concerning Paul Jensen was in the form of several hundred pages of exhibits accessible to the members of the jury during their deliberations. Among those pages could be found Paul Jensen's income tax return revealing a gross income of several million dollars, documentation of a federal investigation of several of Jensen's companies, evidence that Jensen was being investigat-

ed by a Federal Grand Jury assisted by a prosecutor in the instant case, and accounting records which showed that Jensen, through Snowball Investments, had issued a check for $272,000 to Colony. The check was purportedly to cover losses incurred by Colony, and the $272,000 was taken as a personal deduction by Jensen against his income tax obligations.

While the $272,000 matter is logically relevant to the conspiracy charges since Colony could not pay Lancaster its deposits without that money, the evidence gleaned from the other several hundred pages was, in large part, irrelevant. The information contained in those pages served merely to assassinate the character of Paul Jensen, and in so doing, indirectly assassinate the character of James and Weldon Hays. The Hays contend that such "guilt by association" is improper. The Government on the other hand argues that the evidence was necessary in order for the jury to understand the "scope of the conspiracy" and how the appellants were able to misapply Lancaster's funds.

While we are inclined to view the evidence regarding Jensen as less improper than the evidence regarding Colony addressed above, we nevertheless are unable to conclude that the error did not impermissibly affect the jury's deliberations as contemplated by *Kotteakos* given the voluminous quantity of the exhibits and the nature of their content. Nor are we prepared to say that the jury would have found James and Weldon Hays guilty even in the absence of that evidence. See *United States v. Lay*, 644 F.2d 1087, 1091 (5th Cir.1981).

■ Finally, the appellants complain the Government was improperly allowed to introduce evidence regarding a settlement agreement entered into between James Hays, Weldon Hays and Lancaster. Additionally, the appellants argue that the district court committed reversible error by allowing the Government to read several excerpts from civil depositions in which James and Weldon Hays state their reasons for entering into the settlement agreement. Federal Rule of Evidence 408 per-

mits evidence of settlement agreements for purposes other than proving liability, such as demonstrating the prejudice of a witness, negativing a contention of undue delay, or establishing the obstruction of a criminal investigation. The Government does not contend that it offered this evidence for any of the permissible purposes contemplated by Rule 408. Rather, the Government urges that evidence of the settlement agreement assisted the jury in its understanding of the breadth of the conspiracy. In our view, this purpose stands at direct odds with the clear mandates of Rule 408, and therefore the admission of the evidence regarding the settlement agreement between the Hays and Lancaster was error.

■ As the appellants correctly contend in brief, and as the framers of Rule 408 clearly contemplated, the potential impact of evidence regarding a settlement agreement with regard to a determination of liability is profound. It does not tax the imagination to envision the juror who retires to deliberate with the notion that if the defendants had done nothing wrong, they would not have paid the money back. Accordingly, we cannot say that the admission of the evidence of the Hays' settlement with Lancaster did not affect their substantial rights under the plain error standard first enunciated in *Kotteakos*.

## III. CONCLUSION

Having concluded that much of the challenged evidence introduced by the Government during the course of the trial of the appellants was admitted erroneously, and having determined that the cumulative effect of that evidence was prejudicial and affected substantial rights of the defendants, we are constrained to reverse the convictions. Because we have so concluded, we do not reach appellants' arguments regarding the violation of their due process rights under the fifth amendment.

REVERSED.