27 F.3d 566
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
KORN, WOMACK, STERN AND ASSOCIATES, INC., Plaintiff-Appellee,
v.
FIREMAN'S FUND INSURANCE CO., Defendant-Appellant.
 No. 92-2509.
 United States Court of Appeals, Sixth Circuit.
 June 15, 1994.
 
 Before: NELSON and NORRIS, Circuit Judges, and BROWN, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 This case arises out of the defendant insurance company's refusal to indemnify the plaintiff policyholder for a settlement effected without the insurance company's approval. Judgment was entered for the policyholder on a jury verdict in its favor. Because we conclude that the insurance company was improperly barred from attempting to show that the claims against the policyholder were not covered by the contract of insurance, we shall remand the case for further proceedings on that issue. We also conclude that the jury was entitled to find that the insurance company had violated its duty to defend the policyholder, and we shall therefore affirm the judgment insofar as it awards the policyholder its costs of defense.
 
 
 2
 * A
 
 
 3
 The plaintiff Korn, Womack, Stern & Associates (KWS), bought a financial planners' professional liability insurance policy from the defendant, Fireman's Fund Insurance Co., in 1985. The policy insured KWS against liability incurred as a result of "any negligent act, error or omission in the performance of professional services" as a financial planner. Coverage was expressly excluded for damages arising out of the "[f]ailure of securities or other investments to perform as represented" by the insured.
 
 
 4
 The policy committed Fireman's Fund to "defend any claim" made against KWS "for damages covered under this policy[,] even if any of the allegations of a suit are groundless, false or fraudulent." The insurer was given the right to "investigate and, with [the insured's] consent, settle any claim or suit as [the insurer] consider[s] appropriat." The term "claim" was defined as "a demand ... for compensation for damages, including the service of suit...." Upon receipt of a claim, the insured was required to notify Fireman's Fund immediately. "You must not," the policy warned, "except at your own cost, voluntarily make any payments, assume any obligation or incur any expense" in settling a claim.
 
 
 5
 Acting as a sales representative for a securities broker/dealer, KWS offered some of its clients an opportunity to buy interests in limited partnerships organized to operate printing and copying stores under the name American Speedy Printing. One partnership was to do business in the Atlanta area, and another in Boston. KWS sold limited partnership interests to a number of its financial planning clients.
 
 
 6
 The partnerships failed when the general partner absconded with much of the partnerships' capital. Unhappy investors then demanded compensation from KWS for its alleged negligence in recommending purchase of the partnership interests.
 
 
 7
 Witnesses for KWS testified at the trial against the insurance company that KWS had indeed been negligent. KWS, they said, had failed to investigate the nature of the investments and the background of the general partner. If it had performed a reasonable investigation, the witnesses testified, KWS would have discovered that the general partner had no background in the printing business and that Speedy Printing's financial projections were out of line with the financial data of similar firms in the same industry. Had it been reasonably diligent, the testimony indicated, KWS would not have offered the partnership interests to its clients.
 
 
 8
 When KWS received the first of the claims, it promptly notified Fireman's Fund. In a letter dated June 24, 1986, KWS' attorney, Michael Lewiston, told a claims manager for the insurance company that the partnerships were "experiencing severe financial distress," and that "claims and/or statements made to investors" by KWS in selling the partnership interests might have been "misleading and/or actionable." He informed Fireman's Fund that KWS would be meeting with some of the dissatisfied investors on June 27, and he "strongly urge[d]" the insurer to send a representative to the meeting.
 
 
 9
 On July 22, 1986, attorney Lewiston and Norton Stern, a principal of KWS, met with Carroll Snyder of Fireman's Fund. Mr. Snyder later dictated a six-page memorandum outlining the chronology of the Speedy Printing matter and describing the meeting. In his memo, Snyder stated that he told KWS that he was not in a position to state whether the claims from the investors were covered under the insurance policy, because he had not been able to review all the documents pertaining to the case. Snyder wrote that he had asked KWS to provide him all relevant documents, including a copy of the prospectuses for the Speedy Printing offerings.
 
 
 10
 Messrs. Lewiston and Stern testified at trial that all of the Speedy Printing documents they possessed, including prospectuses, were turned over at the July 22 meeting. Snyder testified at trial that he never received such materials from KWS, either at that meeting or later.
 
 
 11
 On August 14, 1986, Mr. Snyder's superior sent him a memo suggesting that Fireman's Fund issue a reservation-of-rights letter to KWS. He also suggested that Fireman's Fund secure the services of an expert to investigate the case. Mr. Snyder did not act on either suggestion.
 
 
 12
 On November 7, 1986, attorney Lewiston informed Fireman's Fund that "various potential defendants" in the Speedy Printing matters had been discussing settlement with the limited partners. Mr. Lewiston sent Fireman's Fund a draft settlement agreement that had been circulated to the parties. Fireman's Fund did not respond to this letter, as far as we know.
 
 
 13
 On February 27, 1987, KWS informed Fireman's Fund that it had exchanged proposed settlement agreements with the limited partners. Copies were furnished to Fireman's Fund. KWS reported that the parties had not yet reached agreement on specific details of a settlement, and an offer was made to provide Fireman's Fund with further information if necessary. Again Fireman's Fund failed to respond.
 
 
 14
 On April 28, 1987, Mr. Lewiston informed Fireman's Fund that a tentative settlement had been achieved. The agreement provided that KWS would pay the limited partners $59,000 in cash and would forgive $32,000 in partnership loans. Fireman's Fund was advised that KWS read the professional liability policy as providing coverage for the settlement. Lewiston asked Fireman's Fund to act quickly in commenting on the proposed agreement, because he expected it to be finalized in the next week.
 
 
 15
 Fireman's Fund did not respond to Mr. Lewiston's letter until September 2, 1987, more than four months later. At that time Fireman's Fund's Mr. Snyder wrote that the insurer was "unable to give this matter any further consideration as we have not been provided with any documentation that was promised in our initial meeting" on July 22, 1986. Snyder asserted that he had not received copies of the limited partnership agreements or the agreement between the broker/dealer and KWS.
 
 
 16
 In October of 1987 KWS entered into a settlement agreement resolving the claims of the limited partners in the Atlanta venture. It is not clear when KWS informed Fireman's Fund of the execution of the agreement.
 
 
 17
 Fireman's Fund advised KWS on April 19, 1988, that it was denying coverage. The denial of coverage apparently applied to claims associated with both the Atlanta partnership and the Boston partnership. Fireman's Fund cited several of the policy's exclusionary clauses, including one that barred coverage of claims arising from the "failure of securities or other investments to perform as represented by [the] insured." The letter stated that the insurer would neither "defend [KWS] in the lawsuit nor indemnify [KWS] for any damages awarded in this suit." Fireman's Fund had received no new information from KWS in the time between the letter requesting additional documentation and the letter declining coverage.
 
 
 18
 The limited partners in the Boston Speedy Printing venture sued KWS in January of 1989. Notwithstanding its letter of the preceding April, Fireman's Fund agreed to provide KWS a defense. (The insurance company noted in this connection that the policy appeared to provide coverage as to claims based on the alleged failure of KWS to discharge its due diligence obligations properly.) Fireman's Fund retained attorney William Joselyn to represent KWS in the Boston litigation, but KWS continued to retain attorney Lewiston. Mr. Lewiston participated in settlement negotiations of the Boston matter. The suit was eventually settled for $64,000, which Fireman's Fund paid.
 
 B
 
 19
 KWS sued Fireman's Fund in a Michigan state court in February of 1991, claiming a breach of the insurance company's obligations under the policy. The complaint requested reimbursement for the amount of the Atlanta settlement, for attorney fees incurred by KWS in both the Atlanta and Boston matters and for damages for lost business, plus statutory penalty interest. Fireman's Fund removed the matter to the United States District Court for the Eastern District of Michigan on diversity grounds.
 
 
 20
 Three motions for summary judgment were filed by the insurance company. The first relied on the policy's exclusion of coverage for voluntary settlements entered into without the insurer's consent. The second sought summary judgment on claims that Fireman's Fund's breach of the insurance contract constituted bad faith and fraud, and on KWS' request for statutory penalty interest. The third sought summary judgment based on the exclusion of coverage with respect to failure of investments to perform as represented by the insured.
 
 
 21
 The district court denied all three motions, concluding that there were factual questions as to whether Fireman's Fund had violated its duty to defend and as to whether the insurance company had acted fraudulently or in bad faith. The district court also concluded, in denying the third summary judgment motion, that the gravamen of the limited partners' claims had been negligence on the part of KWS in failing to discharge its due diligence obligations, and not any misrepresentations as to the investments themselves.
 
 
 22
 At trial, Messrs. Lewiston and Stern testified that on July 22, 1986, they had given Carroll Snyder all the documentation they possessed concerning the Speedy Printing partnerships, including the materials that Mr. Snyder demanded later on. Mr. Snyder contradicted this testimony. Mr. Joselyn, the lawyer retained by Fireman's Fund to conduct the Boston litigation, testified that the insurance company had provided him with all the documents he required and had never suggested a need to get anything further from KWS. Attorney Lewiston testified that he believed, in light of the insurance company's continuing non-responsiveness to his communications regarding the Atlanta claims, that Fireman's Fund had declined coverage for those claims long before the Atlanta settlement was concluded. Fireman's Fund, on the other hand, contended that it had not declined coverage until April of 1988, several months after KWS had settled the Atlanta claims voluntarily.
 
 
 23
 The jury returned a verdict awarding KWS $59,000 to reimburse it for the settlement of the Atlanta claims and $49,755.73 to cover attorney fees. The jury further found that KWS had suffered a loss of business amounting to $100,000 as a result of Fireman's Fund's failure to pay the investors' claims promptly. Finally, the jury found that Fireman's Fund had violated the Michigan Fair Trade Practices Act, thereby entitling KWS to statutory penalty interest at the rate of 12 percent. On December 2, 1992, the district court entered an amended judgment in the amount of $351,753.40, which included penalty interest. The court denied Fireman's Fund's motions for judgment n.o.v. and for a new trial, and this appeal followed.
 
 II
 
 24
 * Having lost the case after a trial on the merits, Fireman's Fund now asks us to set aside the jury's verdict on the ground that the district court acted improperly in denying the third motion for summary judgment. We cannot do so. Denial of a motion for summary judgment may not be appealed by a movant who subsequently loses at trial. Jarrett v. Epperly, 896 F.2d 1013, 1016 (6th Cir.1990).
 
 B
 
 25
 At the close of KWS's case, Fireman's Fund moved for a directed verdict on the ground that coverage was excluded because KWS had voluntarily settled the claim without the permission of Fireman's Fund. KWS contended that the exclusion did not apply because Fireman's Fund had rejected the claim before the date of the settlement and had wrongfully refused to provide a defense. The district court denied the motion.
 
 
 26
 Under Michigan law, an insurer that fails to discharge its duty to defend an insured cannot later disclaim liability under the policy on the ground that a subsequent voluntary settlement made by the insured ran afoul of a policy clause excluding coverage for a voluntary settlement. Elliott v. Casualty Ass'n of America, 236 N.W. 782, 783 (Mich.1931). If an insurer both denies coverage of the loss and refuses to defend a claim against the insured, the exclusionary clause is waived. Id.; Giffels v. Home Ins. Co., 172 N.W.2d 540, 544 (Mich.App.1969).
 
 
 27
 The terms of the policy govern the scope of the duty to defend. Allstate Ins. Co. v. Freeman, 443 N.W.2d 734, 756 (Mich.1989) (plurality opinion). Under some policies, the duty to defend is activated only when a lawsuit has been filed against the insured. With a policy of that type, a clause barring voluntary settlements by the insured will be deemed waived only if an actual lawsuit has been filed against the insured and the insurer has refused to defend against the suit. See Coil Anodizers v. Wolverine Ins. Co., 327 N.W.2d 416, 417-19 (Mich.App.1982); Giffels, 172 N.W.2d at 544.
 
 
 28
 Fireman's Fund argues that the policy in question here was such a policy, and that there could have been no breach of duty with respect to the Atlanta claims because suit was never filed on those claims. The insurance company's characterization of the policy is not correct. Unlike the policies in Coil Anodizers and Giffels, the KWS policy obligated the insurer to defend against all claims made, whether or not the claimants brought suit.
 
 
 29
 The policy stated that Fireman's Fund "will defend any claim against [KWS] for damages covered under this policy even if any of the allegations of a suit are groundless, false, or fraudulent." This might seem to suggest that suit had to be filed, but the policy's definition of a "claim" suggested otherwise. A "claim" was defined as "a demand received by [KWS] for compensation for damages, including the service of suit and the institution of arbitration proceedings against [KWS], but does not include a request for nonpecuniary or injunctive relief."
 
 
 30
 This definition of a "claim" obviously encompassed more than actual litigation; it included any "demand" on KWS for damages of a sort covered by the policy. KWS received such demands from the clients who had purchased the Atlanta limited partnership interests, and the fact that the Atlanta dispute never ripened into litigation is irrelevant.
 
 
 31
 A factual issue was presented as to whether Fireman's Fund's inaction constituted a refusal to defend. Fireman's Fund was thus not entitled to a directed verdict on the basis of the no-voluntary-settlements clause.
 
 C
 
 32
 Fireman's Fund contends that the trial court erred in allowing testimony on the insurance company's acceptance of the defense in the Boston litigation and its settlement of that lawsuit. Reference to the Boston litigation, it is urged, should have been excluded under Rule 408, Fed.R.Evid.
 
 Rule 408 provides as follows:
 
 33
 "Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.... This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."
 
 
 34
 The purpose of the rule is to promote the resolution of disputes short of litigation, thereby conserving scarce judicial resources. The rule recognizes that settlements are more likely to result when parties are free to speak openly during settlement negotiations, without fear that what is said can be used against them at trial. 2 Weinstein & Berger, Weinstein's Evidence p 408 (1992).
 
 
 35
 The rule further recognizes that disputes are often settled for reasons having nothing to do with the merits of a claim. A potential defendant may settle from a simple desire for peace, judging that the expense and inconvenience of litigation are worth paying a certain sum to avoid. This being so, evidence of a settlement may have little relevance to the validity of the claim and may subvert the truth-finding goal of a trial. United States v. Hays, 872 F.2d 582, 589 (5th Cir.1989) ("It does not tax the imagination to envision the juror who retires to deliberate with the notion that if the defendants had done nothing wrong, they would not have paid the money back").
 
 
 36
 Evidence must be excluded under Rule 408 if it tends to show:
 
 
 37
 "(1) either
 
 
 38
 (a) the defendant's offer, or
 
 
 39
 (b) the plaintiff's acceptance of
 
 
 40
 (2) a valuable consideration
 
 
 41
 (3) in compromise of a disputed claim.
 
 
 42
 Such evidence is inadmissible if it is offered to show the invalidity of the plaintiff's claim or the liability of the defendant." 23 Wright & Graham, Federal Practice and Procedure, Sec. 5303 at 176 (1980).
 
 
 43
 Rule 408 does not apply unless there has been a "compromise" of a live, disputed "claim." Evidence of the performance of an undisputed obligation by a defendant is not barred under the rule, because such performance cannot be termed a "compromise." See 2 Weinstein & Berger at p 408 (stating that for Rule 408 to apply, "there must be an actual dispute, or at least an apparent difference of view as to the validity or amount of the claim" (quoting McCormick, Evidence Sec. 274 at 811 (3d ed. 1984))).
 
 
 44
 In Dallis v. Aetna Life Ins. Co., 768 F.2d 1303 (11th Cir.1985), the court admitted evidence of an insurer's payment of benefits to a third party who had filed a claim similar to that of the plaintiff (whose claim was denied), despite the insurer's objection that the payment was a "compromise" covered by Rule 408. The court determined that the payment was not a compromise of a disputed claim, because the insurer and the third party disputed neither coverage nor the amount of the claim.
 
 
 45
 In the matter before us here, the Boston situation involved two distinct types of "claims": claims by the limited partners against KWS, and a claim by KWS against Fireman's Fund. Fireman's Fund accepted KWS's claim, providing a defense and ultimately settling the lawsuit. The insurance company's assumption of the defense and its payment of a $65,000 settlement was not in "compromise" of any dispute between it and KWS, so evidence of the discharge of these obligations was not subject to exclusion under Rule 408.
 
 
 46
 The limited partners' claims against KWS, on the other hand, clearly did represent a live dispute. KWS disputed both the amount and validity of the investor's claims. Under Rule 408, therefore, evidence of the settlement of those claims would be inadmissible to prove the validity of the investors' claims against KWS.
 
 
 47
 The validity of the claims of the Boston limited partners against KWS was not at issue here; the issue was the validity of KWS's claim against Fireman's Fund. The Boston settlement was not admitted to show the truth of the allegations in the Boston investors' complaint, but to show that Fireman's Fund construed the professional liability policy as obligating it to defend and indemnify KWS. Rule 408 did not bar evidence of the insurer's acceptance of the defense and acknowledgment of coverage when such evidence was offered for that purpose. The district court did not abuse its discretion in denying the defendant's motion in limine.
 
 D
 
 48
 The fourth contention made by the insurance company on appeal is that the district court erred in deciding that a duty to defend arose when a claim was made against KWS, and not when a suit was filed. This argument fails for the reasons set forth in Part IIB of this opinion.
 
 E
 
 49
 At trial, Fireman's Fund sought to question Norton Stern, one of the principals of KWS, on his understanding of the policy's exclusionary clauses. KWS objected to this line of questioning, arguing that the insurance company was barred from relying on the exclusionary clauses by reason of the breach of its duty to defend. The trial court sustained the objection, relying on Space Conditioning, Inc. v. Insurance Co. of N. America, 294 F.Supp. 1290 (E.D.Mich.1968), aff'd, 419 F.2d 836 (6th Cir.1970).
 
 
 50
 The insured in Space Conditioning installed faulty heating equipment in a restaurant. The equipment leaked, and the restaurant brought suit. The insurance company refused to provide a defense, and the insured had to hire its own attorney to represent it at trial. Judgment was entered for the restaurant, and the insured then sued the insurance company for the amount of the judgment plus attorney fees.
 
 
 51
 The district court determined that some of the claims made in the restaurant's original suit came within the coverage of the policy and that the insurer therefore had a duty to defend. Id. at 1295. The insurer, the court noted, could refuse to defend only "at its [own] peril, even if [the refusal was] in good faith." Id. The court then stated that "[w]rongful failure to defend may preclude an insurance company from raising a coverage defense in a subsequent action." Id. In support of this proposition, the court cited an insurance treatise and an Illinois appellate case.
 
 
 52
 The court concluded that the insurer was bound to indemnify the policyholder for the entire amount of the jury's general verdict, plus attorney fees, notwithstanding the insurer's argument that the bulk of the general verdict was likely based on claims covered by exclusions. The court rejected that argument, saying that to reduce the insured's recovery on that basis would be to allow the insurer to profit from its wrongful failure to defend. Id. at 1296.
 
 
 53
 No Michigan court has adopted the preclusion rule announced in Space Conditioning, and several subsequent appellate decisions have explicitly rejected the rule. In St. Paul Ins. Co. v. Bischoff, 389 N.W.2d 443 (Mich.App.1986), a policyholder urged the court to "adopt the rule used by courts in Illinois and Connecticut, which provides that an insurer has no right to assert exclusion provisions once it has breached its duty to defend the insured." The court declined to adopt such a rule, noting that under Michigan law the duty of an insurer to defend and its duty to pay under a policy are "severable" and independent. Id. at 444 (citing Zurich Ins. Co. v. Rombough, 180 N.W.2d 775 (Mich.1970)). " 'That an insurer may ultimately be found not liable [under a policy],' " the court noted, " 'is a matter separate and apart from its obligation to defend the insured' "--a duty that may exist even in the absence of actual coverage. Id. (quoting Dochod v. Central Mut. Ins. Co., 264 N.W.2d 122, 123-24 (Mich.App.1978)).[1]
 
 
 54
 Michigan precedent, the Bischoff court explained, gives an insurer two choices: to defend the action under a reservation of rights, or "to repudiate liability, refuse to defend and take its chances that there will be a showing that there is no coverage for the insured's liability." Id. at 444-45 (quoting Detroit Edison Co. v. Michigan Mut. Ins. Co., 301 N.W.2d at 836 (following Elliott v. Casualty Ass'n of America, 236 N.W. 782 (Mich.1931))). The insurer was permitted to pursue the second option and assert that the policy excluded liability for the judgment against the insured. Id. at 445.
 
 
 55
 The reasoning of Bischoff was followed in Harrow Products, Inc. v. Liberty Mut. Ins. Co., 833 F.Supp. 1239 (W.D.Mich.1993), where the court, applying Michigan law, concluded that the insurer had violated its duty to defend under a comprehensive liability policy. Since a suit filed against the policyholder contained allegations that "arguably" came within the scope of the policy, and since the insurer did not know of facts that incontestably established that the claims were not covered, the insurer had a duty to defend the suit. Id. at 1246-49. After the insurer refused to defend, the insured settled the lawsuit and sued the insurer for the amount of the settlement and attorney fees. The court concluded that the insurer was bound to pay the policyholder's defense costs, since it had failed to honor its duty to defend. The court also held that the settlement fell within a policy exclusion, however, and that in spite of its breach of the duty to defend, the insurer was not liable for the settlement. Id. at 1245-46.
 
 
 56
 In the instant case the district court misapplied Michigan law when it precluded Fireman's Fund from raising, as a defense to coverage, the policy exclusion for "failure of investments to perform as represented by an insured." (When the trial court made its erroneous ruling, this exclusion was the only one the applicability of which was still being litigated.) Under Michigan law, Fireman's Fund was entitled to assert this exclusion at trial as a defense against liability for the settlement. Accordingly, the judgment in favor of KWS on the issue of Fireman's Fund's liability for the Atlanta settlement must be vacated.
 
 E
 
 57
 The defendant's sixth argument is that the district court acted improperly in instructing the jury on whether Fireman's Fund was required to pay 12 percent interest on the amount of the settlement of the Atlanta litigation. The argument is well taken. The Michigan statute provides that 12 percent interest shall be assessed only on "claims not paid on a timely basis"--it does not provide for such interest on attorney fees paid by the insured or on profits lost by the insured.
 
 F
 
 58
 The jury awarded KWS $100,000 in damages for loss of business resulting from Fireman's Fund's failure to pay the Atlanta claims promptly. Because we are vacating the portion of the judgment relating to Fireman's Fund's liability for the Atlanta claims, we must vacate the lost business component.
 
 
 59
 The judgment for lost profits, for the $59,000 settlement, and for penalty interest on that amount and on the attorney fees, is hereby VACATED. The award of attorney fees is AFFIRMED. The case is REMANDED to the district court for further proceedings not inconsistent with this opinion.
 
 
 
 [1]
 Under Michigan law an insurer has a duty to defend its insured against a third party's claims if those claims "even arguably come within the policy coverage." Allstate Ins. Co. v. Freeman, 443 N.W.2d at 737 (quoting Detroit Edison Co. v. Michigan Mut. Ins. Co., 301 N.W.2d 832, 835 (Mich.App.1980)). Any doubt as to the existence of a duty to defend must be resolved in favor of the policyholder. Id