IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 7, 2007

Charles R. Fulbruge III
Clerk

No. 06-10200

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

KEVIN GENE BARNES

Defendant - Appellant

Appeal from the United States District Court for the
Northern District of Texas, Wichita Falls
No. 7:05-CR-2-ALL

Before KING, BARKSDALE, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Defendant-appellant Kevin Gene Barnes appeals from a jury verdict finding him guilty of one count of unlawful possession of a firearm as a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Barnes argues that the district court erred in permitting the jury to hear evidence of Barnes's previous convictions during the guilt/innocence phase of the trial. For the following reasons, we AFFIRM the conviction.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The events giving rise to the present conviction center on the seizure of two firearms from the residence of defendant-appellant Kevin Gene Barnes during the execution of a search warrant by the Wichita Falls Police Department on July 12, 2004.

In the summer of 2004, Officer Bobby Dilbeck, of the Wichita Falls Police Department, was investigating possible drug trafficking at Barnes's home. Officer Dilbeck drove by the residence several times during the week prior to July 12, 2004, and noted that, unlike the other houses on the block, Barnes's home was "built like a fort" and had "extraordinary security measures."  In particular, Officer Dilbeck observed that two or three metal gates barricaded the front door, that all the doors were metal, and that there were bars on the windows.  Officer Dilbeck also noticed an inordinate amount of foot traffic to and from the residence, which, based on his experience, is consistent with drug trafficking.

On July 12, 2004, Wesley Sanderson, who had previously met Barnes while both were incarcerated, was instructed by Officer Dilbeck to make a controlled purchase of $50 worth of cocaine from Barnes's residence.[1]  After the transaction, Sanderson gave Officer Dilbeck a white powdery substance that he purportedly bought from Barnes.  Officer Dilbeck performed a presumptive field test on the substance, and it tested positive for the presence of cocaine.  Based on this test and his own observations, Officer Dilbeck obtained a "no-knock" search warrant[2] for Barnes's residence.  Officer Dilbeck also prepared for a SWAT entry in order to secure the residence because the home was heavily

---

[1] Sanderson had approached the police about cooperating after his arrest for possessing dangerous chemicals with the intent to manufacture methamphetamine.

[2] At trial, Officer Dilbeck explained that a " no-knock" search warrant "means that the officers are not going to stand and knock on the door and announce for a few minutes, 'Police, search warrant.'  They are going to go to the house and enter immediately."

fortified and because Barnes had a lengthy prior criminal record, including a conviction for aggravated assault on a police officer, a conviction for aggravated assault on a public servant, eight convictions for evading arrest, five convictions for evading arrest and detention, and three convictions for resisting arrest.

On the evening of July 12, 2004, Officer Dilbeck and several law enforcement and SWAT officers went to Barnes's residence to execute the warrant. Just before 6:00 p.m., Barnes and his ex-wife Sheila Barnes returned to the house, driving a 1999 Chevrolet Suburban. Sheila Barnes entered the residence, but the officers detained and handcuffed Barnes before he could do the same. Upon entry into the house, SWAT Officer Tony Ozuna located Sheila Barnes in the kitchen, ordered her to the ground, where she was handcuffed, and detained her outside while the house was searched.

During the search of the master bedroom, an electronic scale and two bags of marijuana were found in a drawer that also contained men's underwear and a receipt issued to Barnes. The marijuana was tightly compressed like it was "cut off a brick," and was later determined to weigh just over 200 grams. A locked safe was also discovered under a pillow and a blanket in the corner of the master bedroom. Officer Dilbeck asked Barnes if he would open the safe, to which Barnes agreed, entered the combination, and opened the safe, allegedly without hesitation. Inside were two firearms: a Ruger 9 mm handgun and a Charles Daly .45 caliber handgun, both of which were loaded and operational. Also discovered in the safe was a special lotion Barnes used for a recurring skin condition, two bundles containing $1000 cash each, the title to the Suburban Barnes was driving, which was in the name of his girlfriend Yvonia Paige, and a "personal" letter addressed to Barnes from Paige.

That day, Barnes was arrested on state drug-trafficking charges, which were subsequently dropped.

On January 5, 2005, Barnes was charged by a one-count indictment with possessing two firearms after having been previously convicted of a felony offense, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). A jury trial ended in a mistrial on May 19, 2005, after the jury was unable to reach a unanimous verdict. On September 8, 2005, at the conclusion of a second trial, the jury found Barnes guilty. Barnes was sentenced on February 3, 2006, to 115 months' imprisonment and a three-year term of supervised release and was ordered to pay a $100 special assessment.

## II. DISCUSSION

Barnes argues that the district court erred in admitting evidence of his past criminal convictions during his second trial. Specifically, Barnes contends that Officers Dilbeck's and Ozuna's testimony that Barnes's lengthy criminal history necessitated a SWAT entry in executing the search warrant was irrelevant, given that Barnes did not resist the police during the search of his residence or his arrest. Barnes insists that the only purpose served by introducing this evidence was to prove his general criminal propensity "in order to show action in conformity therewith" on this particular occasion, in violation of Federal Rule of Evidence 404(b).

Where the party challenging the trial court's evidentiary ruling makes a timely objection, as Barnes did in this case, we review the ruling under an abuse of discretion standard. United States v. Sumlin, 489 F.3d 683, 688 (5th Cir. 2007) (citing United States v. Hernandez-Guevara, 162 F.3d 863, 869 (5th Cir. 1998)). "Nevertheless, our review of erroneous evidentiary rulings in criminal trials is necessarily heightened." United States v. Hays, 872 F.2d 582, 587 (5th Cir. 1989). "[E]vidence in criminal trials must be strictly relevant to the particular offense charged." Id. (citation omitted).

If we find error in the admission or exclusion of evidence, we review for harmless error. Sumlin, 489 F.3d at 688. "Any error, defect, irregularity, or

4

variance that does not affect substantial rights must be disregarded." Id. (quoting FED. R. CRIM. P. 52(a)). An error affects substantial rights if there is a reasonable probability that the improperly admitted evidence contributed to the conviction. Id. Unless such reasonable probability exists, we are not required to reverse the conviction. Id.

Although extrinsic offense evidence is not admissible to prove the defendant's bad character and action in conformity therewith, it may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." FED. R. EVID. 404(b). In United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978) (en banc), we interpreted Rule 404(b) in light of the other rules of evidence and held that the rule calls for a two-step test: "First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403."[3]

Before we discuss the relevance and probative value of the extrinsic offense evidence, we discuss briefly what the government must prove to obtain a conviction under 18 U.S.C. §§ 922(g)(1) and 924(a)(2), which make it a crime for a convicted felon to possess a firearm. The government must prove beyond a reasonable doubt: (1) that the defendant knowingly possessed a firearm; (2) that before the defendant possessed the firearm, the defendant had been convicted in a court of a crime punishable by imprisonment for a term in excess

---

[3] Federal Rule of Evidence 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

of one year, that is, a felony offense; and (3) that the possession of the firearm was in or affecting interstate or foreign commerce. See §§ 922(g)(1), 924(a)(2). In this case, Barnes stipulated that he had a prior felony conviction, and that both firearms had been in and affecting interstate commerce. Therefore, at trial, the only contested issue was whether he knowingly possessed the firearms, as charged.

Under the first step in the Beechum analysis, the court must determine whether the evidence is relevant to an issue other than the defendant's character. An offer of proof is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401. In this case, the government argued to the district court that Barnes's long history of assaultive offenses against police, as well as evading arrest offenses, was relevant to rebut Barnes's insinuations of police misconduct during the execution of the search warrant. The district court agreed and found the evidence admissible.[4] We also agree.

It was apparent from Barnes's opening statement, and from his first trial, that Barnes's theory of defense centered on disparaging the Wichita Falls Police

---

[4] The district court determined the admissibility of Barnes's criminal offense evidence before opening statements began in this case. Ordinarily it is preferable to wait until the end of the defense case to decide upon the admissibility of other crimes evidence because at that time the court is in a better position to see what the issues are in the case and the need for the evidence. United States v. Brunson, 549 F.2d 348, 361 n.20 (5th Cir. 1977). Here, however, the government was aware from the testimony presented in the previous trial that Barnes would make an issue of the precautionary measures the SWAT team used to execute the search warrant. See id. Also, the government made clear to the district court that it only intended to use such evidence "if [Barnes] in his argument or during cross examination or by his witnesses questioned the officers' reasoning for using the SWAT entry in order to secure [the] residence." Therefore, the district court's early determination of admissibility was not in error, and the government was justified in introducing evidence of Barnes's prior crimes during its case-in-chief. See United States v. Adderly, 529 F.2d 1178, 1182 (5th Cir. 1976) (holding that where intent had been in dispute in a prior trial that resulted in a hung jury, the prosecution was justified in introducing evidence of prior crimes on that issue as part of its case-in-chief).

Department for taking unnecessary precautions in executing the search warrant, namely using an estimated twenty-member SWAT team along with other law enforcement officers to search a home where children apparently resided, detaining Sheila Barnes during the search, and leaving the house in disarray after completing the search. Some relevant excerpts from Barnes's opening statement include:

> [Y]ou will hear how that search warrant was executed. They stormed in there and got Ms. Barnes, handcuffed her, put her on the ground, and then just literally searched that house and every nook and cranny, and tipped over—[sic] When they left it looked like a hurricane had been through there.
>
> . . . .
>
> . . . You will find from the evidence, and I promise you this, you are going to find from the evidence that these officers are either prevaricating liars or they are grossly incompetent.

Although the only contested element of the charge was Barnes's knowing possession of the firearms, Barnes focused on the police officers' execution of the "no-knock" search warrant, in a veiled attempt to impeach the officers testifying. Barnes's prior convictions may have been irrelevant and therefore inadmissible to prove his knowledge of the firearms in the safe, but they were relevant to refute Barnes's implications that the police acted inappropriately during the search of his residence and to explain why the police executed a SWAT entry.

The pertinent prior offense testimony elicited from the government's first witness, Officer Dilbeck, was as follows:

[PROSECUTION:]    After you got the search warrant from Judge Sparkman, what did you do next?

[OFFICER DILBECK:]  I made preparation to execute the warrant.

[PROSECUTION:]     And what do you do to prepare for executing the search warrant?

[OFFICER DILBECK:] The first thing that we are required to do per our rules and regulations, we have to fill out what is called a target analysis on the suspect that you are going to run the warrant on, and that is my first step. I did the target analysis on Mr. Barnes.

[PROSECUTION:]     What is taken into consideration when you do the target analysis?

[OFFICER DILBECK:] There is [sic] several things—the degree of difficulty of the warrant, you know, any special type of obstacles you have to overcome such as the locked gates that are present, any type of dogs, the presence of weapons at the house, the possibility of, the criminal history of the suspect himself.

[PROSECUTION:]     And in this case did the Defendant's criminal history play a part in your assessment for serving that warrant?

[OFFICER DILBECK:] Yes. Mr. Barnes had a lengthy criminal history. I checked and it indicated he had 23 convictions for different violations, 14 of those violations were for resisting arrest and assault on a peace officer, evading arrest, those types of offenses. And anyway, the end result of the target analysis indicated that it was a mandatory SWAT call-out warrant.

Next, SWAT Officer Ozuna testified that "due to the convictions and the prior arrests [of Barnes] and the way the house appeared to be fortified, it was mandatory SWAT entry." Because both officers' prior offense testimony had a tendency to show the necessity of the SWAT entry, an issue that Barnes made

8

of consequence throughout the trial, the testimony of Barnes's prior convictions was relevant to an issue other than character. See FED. R. EVID. 401.

Furthermore, it is not necessary that the extrinsic offense evidence neatly fit within one of the exceptions listed in Rule 404(b)—proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident—in order to be admitted, as this list is not exhaustive. See Wright & Graham, Federal Practice and Procedure: Evidence § 5248 (explaining that "[t]he list of 'exceptions' in Rule 404(b) is really no more than a set of examples of instances in which the use of the evidence does not offend the general rule of exclusion"). Exceptions have been recognized for conspiracy cases, for proof of guilty knowledge through evidence of spoliation, for rebuttal of an entrapment defense, for corroboration or impeachment of testimony, as well as others. Id.; see, e.g., United States v. Barrentine, 591 F.2d 1069, 1081 (5th Cir. 1979) (allowing the government to show that a government witness's prior arrest, which defense counsel used in an attempt to impeach the witness, resulted from a criminal act performed at the direction of the defendant); United States v. Kaiser, 545 F.2d 467, 476 (5th Cir. 1977) (permitting the prosecution to prove that admissions made by the defendant, about which the witness testified, were made while the witness was being kidnapped by the defendant, in order for the jury to understand why the admissions were made). "[T]he general rule of exclusion in Rule 404(b) only excludes evidence of other crimes when offered to prove the conduct of a person by resort to an inference as to his character." Wright & Graham, supra, at § 5248. In this case, the general rule of exclusion in 404(b) was not violated because Barnes's prior crimes were not offered to prove his knowing possession of the firearms by inference to his bad criminal character, but, instead, offered to explain the necessity of the SWAT entry into Barnes's residence during the execution of the search warrant.

Finding the evidence relevant does not end our inquiry. We must discuss the second step in the Beechum rubric and determine whether the probative value of the criminal offense evidence is substantially outweighed by its prejudicial effect, or any other factor listed in Rule 403, including confusion of the issues, misleading the jury, or considerations of undue delay, waste of time, or needless presentation of cumulative evidence.[5]

Although the district court did not make any explicit findings on the probative value/prejudice inquiry,[6] we find it apparent from the record that the danger of unfair prejudice from the presented testimony was slight compared to the probative value of such evidence. Specifically, the government only questioned Officers Dilbeck and Ozuna about Barnes's prior criminal offenses to explain the factors warranting the use of a SWAT entry during the search of Barnes's residence. Even then, Barnes's criminal history was mentioned in general terms. Outside of the predicate felony conviction, the government did not mention Barnes's criminal history again during the trial, including in its closing argument.[7] On the other hand, Barnes attempted to establish that the police acted inappropriately during his opening statement, his cross-examination of Officers Dilbeck and Ozuna, his direct examination of defense witness Sheila Barnes, and his closing argument. But for the officers' testimony outlining the reasons for the procedures employed the day of the search, which included their

---

[5] In his appellate brief, Barnes does not address whether the probative value of his criminal offense record was substantially outweighed by the danger of unfair prejudice. He simply relies on his argument that the evidence was irrelevant, and therefore, inadmissible by the district court. He then proceeds to discuss how the admission of the evidence was not harmless error because it affected his substantial rights.

[6] Upon a party's request, the district court must articulate the Beechum probative value/prejudice weighing on the record. United States v. Robinson, 700 F.2d 205, 213 (5th Cir. 1983). Barnes, however, never requested such findings. See id.; see also United States v. Williams, 343 F.3d 423, 437 n.13 (5th Cir. 2003).

[7] We find it perplexing, however, that in Barnes's closing argument, he mentioned his prior convictions two different times.

knowledge of Barnes's criminal record for evading the police, there would have been no evidence to rebut the insinuations that the police methods were unwarranted or that the police officers were "prevaricating liars" or were "grossly incompetent."[8]

Moreover, the district court "further mitigated any potential prejudicial effect" by its instructions to the jury. Williams, 343 F.3d at 437 (citing United States v. Gonzalez, 328 F.3d 755, 760 n.2 (5th Cir. 2003)). At the conclusion of the case, the court twice instructed the jury that it was charged only with deciding whether the government proved beyond a reasonable doubt that the defendant was guilty of the crime charged. The court also instructed that the "defendant is not on trial for any act, conduct, or offense not alleged in the Indictment. The fact that a defendant may have been accused of any other offense may not be considered by you for any purpose."

Therefore, we find that the danger of unfair prejudice did not substantially outweigh the probative value of the prior offense testimony in this case, and the district court did not abuse its discretion in permitting the testimony under Rule 404(b). Furthermore, because we find no error in the district court's admission of the evidence, the harmless error analysis is unnecessary.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the conviction.

---

[8] As for the other requirements of Rule 403, Barnes does not contend that the few lines of testimony at issue here could have confused the issues, misled the jury, wasted time, or resulted in cumulative evidence. See FED. R. EVID. 403.