**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Donald AUSTIN, Defendant–Appellant.**

**No. 94–2541.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 10, 1995.

Decided May 5, 1995.

Rehearing Denied June 23, 1995.

Barry Rand Elden, Asst. U.S. Atty., Gillum Ferguson (argued), Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Matthew F. Kennelly (argued), Cotsirilos, Stephenson, Tighe & Streicker, Chicago, IL, for defendant-appellant.

Before FLAUM and EASTERBROOK, Circuit Judges, and CRABB,* District Judge.

FLAUM, Circuit Judge.

Defendant Donald Austin was convicted and sentenced to 8½ years for knowingly buying and selling counterfeit works of art. Although we uphold his conviction, the denial of his motion for a new trial, and all but one of the trial court's sentencing determinations, we remand for a reconsideration of whether Austin deserved a sentencing enhancement under the Guidelines for being an "organizer or leader."

## I.

Donald Austin owned and operated Austin Galleries, a chain of art galleries in Chicago, Detroit, and San Francisco. Austin, whose business grew from one Chicago gallery in the mid-1960s to over thirty galleries in the mid-1980s, was a "hands-on" manager who took an active interest in all facets of his business and in each of his galleries. Austin Galleries specialized in modern and contemporary artists, including Salvador Dali, Joan Miró, Pablo Picasso, and Marc Chagall, and sold mostly lithographic and serigraphic prints of their works. Although the individual galleries had prints on hand, many customers purchased prints on a "to-be-ordered" basis; a customer would see a copy in a gallery, and order the actual print from Austin's headquarters in Palatine, Illinois.

Lithographic and serigraphic prints can be divided into three categories for the purposes of this opinion.[1] Lithographs and serigraphs are most valuable when they are part of an "original" limited edition print, a "category 1." Art industry standards require that an original be prepared under the artist's supervision. The artist signifies his acceptance of the edition by signing and numbering them. The artist may also reserve a small percentage of the edition for his own use or that of the publisher. Called "artist's proofs," such works are identified by the designation H.C., E.A., or A.P., usually in place of the edition number.[2] Less valuable than originals are "afters" or "category 2" prints. Afters are copies of an original work made by others with the artist's permission; these copies have nominal value in the decorative art market. Finally, there are "category 3" prints:

---

* The Honorable Barbara B. Crabb, of the United States District Court for the Western District of Wisconsin, is sitting by designation.

1. We rely on the categories assigned to prints by government expert Bernard Ewell, who testified that this system is in line with that of the International Fine Print Dealers Association.

2. As described by one authority,

> Artist's Proofs (and presentation proofs) are impressions reserved as remuneration or gifts primarily for the artist, but also, occasionally, for the printer, editor, hangers-on, and others involved in the production or success of an edition. As the creators' percentage of the pull (normally 5 to 20 percent of the regular edition, depending on how many impressions in the overrun survived editing for quality), those

impressions are usually distinguished from the regular edition by the margin notation "Artist's Proof" ("A.P.") or in Paris and where flamboyance is desired, "Epreuve d'Artiste" ("E.A.") or *"Hors de Commerce"* ("H.C."—apart from the commercial edition). Not surprisingly, artist's proofs, ostensibly *hors de commerce*, always seem to find their way *into* commerce.... Some cunning contemporary publishers have in fact had their artists write "Artist's Proof" on the bulk of the edition to exploit the common belief that artist's proofs are more desirable than other proofs.... Artist's proofs are no more spiritually anointed and no more pampered than any other copies in the run; they are in fact customarily extracted from the overrun (most printers and publishers hate to throw out perfectly good proofs).

Theodore B. Donson, Prints and the Print Market 73–74 (Thomas Y. Crowell 1977).

unauthorized reproductions of an artist's work (or independent works made to look like something the artist might have created), made without the artist's involvement or approval. These works do not have an established market, and if they carry an artist's signature, they are forgeries.

Austin sold most of his art as signed original limited edition prints. His customers thought they were buying originals. The customers were wrong; most of what Austin sold were forgeries. Several of Austin's employees recalled that they never seemed to run out of any print and that there was never a time when a customer requesting a specific edition number was told that the number had been sold or was otherwise unavailable. Others noticed that a number of works they were selling were obvious forgeries and brought this to Austin's attention, to no avail. Two employees even tried removing what they thought were frauds from the walls of one gallery, but when Austin learned of this he merely became angry and ordered them to place the prints back on display.

Acting on complaints, the Federal Trade Commission ("FTC") brought suit against Austin in May, 1988. A district court placed a temporary restraining order on Austin on May 5, 1988, restricting Austin's sales of Dali, Picasso, and Chagall prints and permitting the FTC to enter Austin's galleries to inspect his prints and documents. The inspection yielded widespread evidence of forgeries among Austin's inventory and prior sales. One expert who examined 490 prints, including 387 in current inventory and 103 sold to customers, did not find a single authentic original. Records also revealed that Austin had been able to acquire prints in suspiciously large quantities, some quantities even exceeding the number in the actual edition of the print. The results of the investigation also raised concerns about the authenticity of Austin's Miró prints, and the court, after the FTC amended its complaint, added Miró's works to the list of those Austin could not sell.

Following the investigation, in April, 1990, Austin entered into a settlement agreement with the FTC. The agreement, as approved by the court, forbade Austin from making misrepresentations in the sale of artwork. Austin also agreed to surrender all of his pencil-signed Mirós, Chagalls, and Picassos. Austin was allowed to sell Dalis so long as he did not represent them as authentic works of art. Additionally, the court ordered Austin to pay $625,000 into a consumer redress fund to be administered by the FTC, with the condition that if he did not pay the entire sum by January 1, 1991, or if he declared bankruptcy before that day, the amount would increase to $1.5 million. As a final part of the settlement, Austin signed a stipulation for judgment admitting the allegations of fraud contained in the complaint. The stipulation was to be filed only in the event Austin went into bankruptcy or defaulted on his payments to the FTC.

The FTC settlement failed to deter Austin. Austin did not turn over all of the Chagalls, Mirós, and Picassos as required. He also attempted to sell several Chagalls to one of his art suppliers, Michael Zabrin, and to sell to another supplier, Phillip Coffaro, a "package" of Chagalls and Mirós, although both men turned him down. Most significant, Austin sold nine Chagall prints to a customer, Merlin Hanson, for $50,000, with an option to repurchase within six months. Austin originally had requested only a loan from Hanson and had offered the prints as collateral, but Hanson's financial advisor had insisted on the buy-back arrangement to avoid any losses should Austin enter bankruptcy. Austin represented the prints as having a value of $70,000 wholesale and $140,000 retail. Prior to the sale, which was made eleven days after the FTC settlement, an FTC expert had informed Austin's attorney that at least one of the prints sold to Hanson was a fake.

Following these events, the government initiated criminal proceedings against Austin, and a grand jury indicted him on March 11, 1993. Counts I through VII of the indictment alleged violations of the mail and wire fraud statutes, 18 U.S.C. §§ 1341 & 1343, while Count VIII charged Austin with causing money he knew to have been taken by fraud to be transmitted in interstate commerce, 18 U.S.C. § 2314. The first five counts related to transactions prior to the

FTC proceeding, while the last three concerned the Hanson sale. In the course of its investigation, the grand jury subpoenaed Austin's records for sales of Chagalls after 1988. In response, Austin did not turn over information regarding the Hanson sale; Austin testified at trial that he thought the sale was a loan and did not have to be reported.

The government, which relied heavily on the information produced by the FTC investigation, introduced at trial extensive evidence of fraud against Austin. A jury returned guilty verdicts against Austin on all counts, and the trial judge sentenced him to 102 months imprisonment to be followed by two years supervised release. The court also ordered Austin to pay into the FTC's compensation fund $505,000, which was the difference between the restitution he had already made, about $120,000, and the original sum stipulated in the FTC settlement, $625,-000.

## II.

On appeal, Austin raises several challenges to his conviction. He contends that double jeopardy barred his conviction because of the earlier FTC suit and settlement and that the trial court erred in admitting much of the government's evidence. He also requests in the alternative a new trial on the grounds of newly discovered evidence that the government had not disclosed pursuant to its obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Austin first maintains that the FTC settlement had placed him once in jeopardy for any fraud he might have perpetrated on his customers. Austin does not argue that the $625,000 he was initially required to pay into a "consumer redress fund" constituted a punishment for his actions; he admits that that sum was a remedial payment. Rather, Austin submits that when he defaulted on the $625,000 installment plan and his liability jumped to $1.5 million, the $875,000 increase constituted a punishment above and beyond his agreement to return his customers' money. This civil sanction, he suggests, placed him once in jeopardy, thereby rendering the criminal trial an unconstitutional proceeding.

Austin is correct that "punitive" civil sanctions can constitute punishment for the purposes of the double jeopardy clause. *United States v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989); *cf. Austin v. United States,* — U.S. —, —, 113 S.Ct. 2801, 2812, 125 L.Ed.2d 488 (1993). Austin is also correct that even where a civil punishment precedes a criminal trial, jeopardy may attach. *United States v. Torres,* 28 F.3d 1463, 1465 (7th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 669, 130 L.Ed.2d 603 (1994); *United States v. Furlett,* 974 F.2d 839, 843 n. 2 (7th Cir.1992). Austin's argument falters, however, when he asserts that if $625,000 satisfied the FTC's remedial interests, any payment above that amount is properly categorized as "a deterrent or retribution." *Halper,* 490 U.S. at 448–49, 109 S.Ct. at 1901–02. The FTC accepted $625,-000 initially because it feared that the defendant might go into bankruptcy. The FTC's offer amounted to a discount for prompt and early payment of the total loss Austin had caused, a sum the FTC estimated to be in excess of $3.8 million. When Austin violated the terms of the settlement and the amount he owed increased, the FTC was still only holding Austin liable for an amount less than that it thought his fraud had caused. Thus, the net consequence of the FTC's actions was still remedial. Such circumstances do not implicate the Double Jeopardy Clause. *Furlett,* 974 F.2d at 843–44.

Second, Austin objects to the trial court's admission of extensive evidence relating to the FTC settlement, including the terms of the consent decree and Austin's stipulation in the settlement admitting to the allegations in the FTC's complaint. He asserts that this evidence was unfairly prejudicial because it likely led the jury to think that "the same issues had already been determined in the civil action." *United States v. Konovsky,* 202 F.2d 721, 727 (7th Cir. 1953); *see also United States v. Hays,* 872 F.2d 582, 588–89 (5th Cir.1989); *United States v. Cook,* 557 F.2d 1149, 1153–54 (5th Cir.1977), *cert. denied,* 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 767 (1978). We review the admission of this evidence for abuse of

discretion. *United States v. Penson,* 896 F.2d 1087, 1092 (7th Cir.1990).

◼ Austin's contentions on this point are equally unavailing. Prior to trial, the government informed Austin that it would introduce the consent decree in order to show Austin's criminal intent in subsequently violating its conditions. While Federal Rule of Evidence 408 prohibits the admission of statements made in the course of settlement to prove liability and Rule 404(b) prohibits the admission of other wrongs in order to show action in conformity therewith, both rules allow the admission of such evidence when offered for another purpose. The evidence from the civil suit served a number of alternative purposes. First, it showed that Austin was on notice when he subsequently sold other prints that those prints were forgeries. It also demonstrated Austin knew he could not sell those prints without reporting the sale to the FTC. Moreover, the facts from the FTC case both provided the background for Austin's indictment and laid the evidentiary foundation for many of the governments exhibits in the criminal proceeding. Finally, the stipulation itself constituted a direct judicial admission to the accusation of fraud in the conduct underlying the indictment. These purposes provided sufficient bases to introduce this evidence against Austin.

◼ We also do not think that the evidence, in light of its relevance, was so "unfairly prejudicial" that the trial court should have excluded it under Fed.R.Evid. 403. The cases Austin cites as supporting exclusion are wholly distinguishable. We determined that evidence of an injunction in *Konovsky* was improperly admitted in a criminal trial because the injunction concerned conduct that occurred three weeks after the misdeeds alleged in the criminal indictment. *Konovsky,* 202 F.2d at 726–27. The *Hays* court found reversible error in the admission of the testimony of eleven witnesses regarding Hays's "unscrupulous conduct" near the time of conviction when "[l]ittle, if any, of that testimony [wa]s relevant to the offenses with which either Weldon Hays or his father were charged." *Hays,* 872 F.2d at 587. Similarly, in *Cook,* the court determined that

prior injunctions issued against the defendants were at most "peripherally relevant" to their prosecution, and the defendants had neither admitted nor denied any wrongdoing in the injunctions. *Cook,* 557 F.2d at 1153–54. These cases contrast markedly with the instant case, in which the circumstances of Austin's prior settlement with the FTC bore directly on his criminal charges. "To have excluded this evidence entirely would have resulted in an incomplete presentation of the facts to the jury." *Bohannon v. Pegelow,* 652 F.2d 729, 734 (7th Cir.1981). The trial court thus did not abuse its discretion in admitting this evidence.

◼ Austin next asserts that the trial court erred in admitting repeated instances of hearsay, improper opinion testimony, and and other incompetent evidence. Austin does not argue that any single improperly admitted piece of evidence skewed his trial; rather, he contends that the cumulative effect of these admissions so polluted the atmosphere in which he sought to defend himself that we should vacate his conviction. Austin admits that he made no contemporaneous objections to this evidence at trial and that we may correct the errors only if they seriously affected his substantial rights. Fed. R.Crim.P. 52(b); *United States v. Olano,* — U.S. —, — – —, 113 S.Ct. 1770, 1778–79, 123 L.Ed.2d 508 (1993).

Austin's catalogue of improper evidence has four parts. First, he asserts that the government elicited improper opinion and hearsay statements "masquerading as expert opinion" from two Postal Inspectors. Second, Austin maintains that a number of witnesses qualified as experts also delivered "significant amounts of patent hearsay" by speaking about what other museums had authorized and about the mental and physical capacities of one artist. Third, Austin complains that former Austin Galleries employees spoke about others' concerns about some prints, and that one testified that Austin had not told him about the FTC case, all in violation of hearsay rules. Finally, Austin argues that FTC attorneys inappropriately testified to their opinions of the case.

Austin's objections here are almost uniformly without merit; our review of the record does not indicate that the testimony of these government witnesses overstepped the bounds of the rules of evidence. Furthermore, even if Austin were correct on every point, the overwhelming weight of the case against Austin makes it clear that these alleged errors did not affect the outcome of the proceedings such that we should consider invoking our discretion under Rule 52(b). *Olano,* —— U.S. at ——, 113 S.Ct. at 1778–79.

Finally, Austin contends that the district court erroneously denied his motion for a new trial without holding a hearing, a ruling we review solely for abuse of discretion. *United States v. DePriest,* 6 F.3d 1201, 1216 (7th Cir.1993). Austin maintained in his post-trial motions that two of the government's expert witnesses had previously participated in an organized government effort to prosecute art fraud and that they were part of a conspiracy to restrict the supply of Dali lithographs in order to reap personal financial rewards. Austin argued in a motion for a new trial that the government had known this information but had failed to disclose it to the defense in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The district court denied the motion and refused to grant Austin additional time to gather evidence in support of these claims. We agree with the government that these somewhat outlandish accusations did not constitute grounds for a new trial. To the extent the government was under a *Brady* obligation to disclose information, it had given the defense these witnesses' curricula vitae, which indicated that the witnesses had previously testified for the government. Additionally, even if plausible, such allegations would not have cast doubt on the authenticity of the Dalis, which was not really at issue in the trial, or on expert testimony concerning the Chagall, Miro, and Picasso prints. The district court did not even begin to approach the limits of its discretion in denying this motion. *United States v. Kamel,* 965 F.2d 484, 490 (7th Cir. 1992).

The district court also properly refused the defense any extension of time to gather new evidence. When the court denied Austin's requested continuance to develop this evidence, eight months had passed from the end of the trial. That delay should have been time enough to assemble new evidence, and we do not believe that court abused its discretion by not allowing Austin further extensions.

### III.

Austin also raises four issues relating to his sentencing. The district court calculated Austin's sentence level at 29: a base offense level of 6 for fraud and forgery, U.S.S.G. § 2F1.1(a); a 13–level increase for loss of between \$2.5 and \$5 million, U.S.S.G. § 2F1.1(b)(1)(N); a 2–level increase for defrauding more than one victim, U.S.S.G. § 2F1.1(b)(2)(B); a 2–level increase for violating the injunction in the FTC case, U.S.S.G. § 2F1.1(b)(3)(B); a 2–level increase for obstruction of justice, U.S.S.G. § 3C1.1; and a 4–level increase for being an organizer or leader, U.S.S.G. § 3B1.1(a). Because Austin had no prior convictions, he was in Criminal History Category I, which gave him a sentence range of 87 to 108 months. At the sentencing hearing, the district court stated:

> [E]ven this conviction, based upon your activity since this conviction and based upon what you've said to me today, still has not brought you to a sense of reality as to what has occurred.... Based upon everything that I've heard and based upon everything that I've seen in terms of the presentation, in my view the appropriate sentence in this case will be and is 102 months. I am going to order that you serve that time in custody.

Austin now contends that the district court made four sentencing errors: (1) that the court improperly assessed the loss attributable to his conduct; (2) that he deserved a downward departure based on the disparity between his sentence and that of his suppliers; (3) that his conduct did not merit an enhancement for obstruction of justice; and (4) that his conduct did not merit an enhancement for his role as a leader and organizer of a criminal organization. We think the dis-

trict court properly calculated Austin's sentence with regard to the first three points but remand for want of specific findings as to whether he could be properly characterized as a leader or organizer.

■ Austin first argues that the district court should not have imposed a 13–level increase in his offense level based on the amount of loss attributable to his conduct. U.S.S.G. § 2F1.1(b)(1). Section 2F1.1(b)(1) provides a thirteen-level increase for any loss between $2.5 and $5 million, and the government argued at sentencing that the amount of loss was in excess of $3.8 million. The government based this calculation on Dali sales of approximately $2 million and Miró, Chagall, and Picasso sales totalling almost $1.8 million. In so doing, the government argued that nothing Austin sold had any actual value. The government based this assessment on its inspection of Austin's inventory in 1989 as well as approximately 100 previously-sold pieces, almost all of which were worthless fakes. In open court, Austin's attorney stated his objection to the amount of loss calculation as follows:

> Your Honor, the only objection, and it's not a material one because it doesn't change the guidelines, is that we believe that the amounts that are attributable to Dali were in some respects based on sales of Dali works that were not—whose authenticity was not at issue. We believe that there was approximately a million dollars worth of Dali sales revenues that were counted that should not have been counted.

Austin made a similar argument in his written objections to the presentence report, in which he submitted only "that the total amount on the Dali sales is in error." Austin thought there was error because the government had based its assessment only on what Austin had in stock and not what he had sold, some of which may well have had value, and that the Dali sales added up to only slightly more than $1 million. The government now admits that the figure was about $1 million too high but notes that the difference does not change the Guidelines range and is not grounds for resentencing, points with which we agree.

By more or less accepting the $2.5 to $5 million range, Austin waived his objection to sentencing calculations on this point, and we can reverse only for "clear error." *See United States v. Haddon,* 927 F.2d 942, 952 (7th Cir.1991). Austin now contends that the government's entire methodology was faulty because it had not shown all sales to be fraudulent and because its figure was primarily based on items as to which there was no proof of authenticity rather than items fraudulently sold. Austin also argues that the government focused its efforts entirely on the Dalis and did not prove that the Miró, Picasso, and Chagall prints he had sold lacked value. Instead, Austin suggests that the court should have used the $505,000 in restitution ordered by the court as the loss amount.

Contrary to Austin's contentions, the government's methodology, and the district court's acceptance of it, was not improper. From the fact that Austin's inventory (as well as a number of investigated sales) contained almost nothing but worthless forgeries, the government and its experts extrapolated the value of what Austin had sold his customers: nothing. Therefore, the government reasoned, the loss Austin inflicted on his customers equaled the sales price. The Application Notes to the Guidelines loss section specify that "the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1, comment. (n. 8). Austin protests that the government only investigated a fraction of the prints sold and that many of those prints may have had some value, at least as "category 2" prints, and that this value should have been subtracted from the sales figures. *See United States v. Mau,* 45 F.3d 212, 215 (7th Cir.1995); *United States v. Mount,* 966 F.2d 262, 265 (7th Cir.1992). This factually unsupported speculation does little to counter the government's proof that even if the pieces Austin sold between 1984 and 1990 were not completely worthless, $0 was the best estimate of their worth. The district court was well within the bounds of reason in agreeing with the government's procedure for calculating loss. Furthermore, as to Austin's suggestion that the loss be

equated with the restitution ordered, the government clearly and repeatedly demonstrated that that figure woefully underestimated the extent of Austin's fraud.

■■■ Second, Austin claims that the district court erroneously concluded that it could not depart downward in the Guidelines on the basis of sentence disparity between his own sentence of 102 months and those of two of his suppliers, Coffaro and Zabrin, who received sentences of sixteen months and one-year-and-a-day respectively. The district court, after listening to both Austin's and the government's arguments on any possible departure because of the disparity, stated that "there are no factors warranting a departure in this case and the motion will be denied." We lack jurisdiction to review the district court's refusal to depart from the Guidelines where that refusal reflects an exercise of the judge's discretion, *United States v. Poff,* 926 F.2d 588, 590 (7th Cir.) (*en banc*), *cert. denied,* 502 U.S. 827, 112 S.Ct. 96, 116 L.Ed.2d 67 (1991); *see also United States v. Ojo,* 916 F.2d 388, 394 (7th Cir.1990), and the present case represents just such an exercise. Even were we to conclude that the district court had thought it lacked the authority to depart, that conclusion would require us to revisit our holding that disparity in sentences, standing alone, is not a basis for departure from the Guidelines. *United States v. Edwards,* 945 F.2d 1387, 1398 (7th Cir.1991), *cert. denied sub nom. Martin v. United States,* 503 U.S. 973, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992), and *Hampton v. United States,* 503 U.S. 973, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992); *United States v. Fazio,* 914 F.2d 950, 959 n. 15 (7th Cir.1990); *United States v. Cea,* 914 F.2d 881, 889 (7th Cir.1990); *United States v. Guerrero,* 894 F.2d 261, 267 (7th Cir.1990). We decline to do so.[3]

Third, Austin challenges the district court's imposition of a 2–level enhancement to his sentence for obstruction of justice under U.S.S.G. § 3C1.1. At sentencing, the government argued that three factors made Austin eligible for this enhancement: his violation of the court order from the FTC suit by concealing certain Chagall prints during the settlement of that case, his concealment of certain records relating to the sale of those prints from the grand jury in response to a subpoena, and his false trial testimony. Austin objects to the first two factors on grounds of "double counting." He notes that the district court imposed an enhancement under § 2F1.1(b)(3)(B) for his violation of the FTC injunction by selling the Chagall lithographs to Hanson. Thus, he concludes, the court could not penalize him twice for that same activity by simply giving it a new name. Alternatively, Austin contends that the district court did not make the specific findings required to justify the enhancement, especially with regard to the alleged perjury, and that a remand is warranted. *See United States v. Holt,* 969 F.2d 685, 688 (8th Cir. 1992); *see also United States v. Dunnigan,* — U.S. ——, ——, 113 S.Ct. 1111, 1117, 122 L.Ed.2d 445 (1993).

■■■ We disagree with Austin's contention that the first two factors did not justify the obstruction of justice enhancement. Austin is correct that double counting is not permitted under the Guidelines. *See United States v. Stevenson,* 6 F.3d 1262, 1270 (7th Cir.1993). The Application Notes to § 3C1.1 also specifically forbid an increase for obstruction of justice where the defendant is convicted for a number of related offenses, including perjury, contempt, failure to appear, and misprision of felony. U.S.S.G. § 3C1.1 comment. (n. 6). However, the Hanson sale, for which Austin received the § 2F1.1(b)(3)(B) enhancement, is factually distinct from Austin's concealing Chagall and Miró prints from the FTC. Although Austin's concealment of the prints enabled him to make the sale, the concealment and the sale are distinct acts that do not collapse into one another. Austin's failure to turn records of the Hanson sales over to the grand jury

---

**3.** We note also that there are important factual differences between the culpable conduct of Austin, who directly defrauded hundreds of customers and refused to acknowledge his guilt, and that of Coffaro and Zabrin, who sold to dealers rather than the public, cooperated with the government, admitted their guilt and tried to set matters straight. The district court expressly rejected the comparisons between Austin and Coffaro and Zabrin, and that rejection seems appropriate: these differences clearly justified the sentencing disparity.

despite a subpoena also constitutes obstruction. Again, the failure was only possible because Austin made the improper sale, but it was nonetheless conduct separate from the sale. Furthermore, the court was free to reject Austin's defense to the second factor—that he considered the sale a loan—as it apparently did.

■ The district court's findings on this point were also sufficient. The court not only relied on Austin's presentence report, but also heard argument in which the government identified how Austin's conduct supported the enhancement and explicitly adopted the government's position on the double-counting issue. The Eighth Circuit, in distinguishing *Holt,* noted that such statements, when coupled with "the court's familiarity with what had occurred at trial," provide ample foundation for the imposition of an enhancement for obstruction of justice. *United States v. Mills,* 987 F.2d 1311, 1318 (8th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 403, 126 L.Ed.2d 351 (1993). We agree with that conclusion here. Additionally, Austin's objections to this enhancement focused on the problem of double counting; he did not object to the facts underlying the obstruction enhancement. Even under *Holt,* a district court's obligation to make more specific findings arises only when there is a disputed factual issue. *See Holt,* 969 F.2d at 688.

■ Austin does correctly argue that the district court did not make sufficient findings to support the obstruction enhancement based on the government's claims of perjury. The Supreme Court held in *Dunnigan* that when the district court bases a § 3C1.1 enhancement on the defendant's perjury at trial, it should preferably identify each element of perjured testimony, but must at least "make[ ] a finding of an obstruction or impediment of justice that encompasses all of the factual predicates for a finding of perjury." *Dunnigan,* —— U.S. at ——, 113 S.Ct. at 1117; *see also United States v. Dillard,* 43 F.3d 299, 308–09 (7th Cir.1994) (court made specific finding of perjury at trial); *United*

*States v. Sanchez,* 32 F.3d 1002, 1006 (7th Cir.) (court found that "defendant was so flagrant in his testimony and so unbelievable that I could not and will not tolerate that kind of conduct in this court"), *cert. denied,* —— U.S. ——, 115 S.Ct. 346, 130 L.Ed.2d 302 (1994); *United States v. Rodriguez,* 995 F.2d 776, 779 (7th Cir.) (court found that "in your case the facts simply cry out for the enhancement for having given false testimony before the jury"), *cert. denied,* —— U.S. ——, 114 S.Ct. 648, 126 L.Ed.2d 605 (1993); *United States v. Jones,* 983 F.2d 1425, 1430 (7th Cir.1993) (court specifically discounted defendants' testimony). The district court here made no such statement. All the court said was that "[t]he objections for the two-point enhancement will be overruled for the reasons set forth in the government's response...." A district court need not say much more in explaining an obstruction enhancement for perjury, *see Jones,* 983 F.2d at 1430, but it may not simply overrule objections and adopt the government's position. In announcing its sentence, the court did later note that Austin had repeatedly and disingenuously tried to lay blame at the feet of others and that his testimony had often been incredible. These subsequent remarks, which were not made in the context of the obstruction-of-justice discussion, cannot constitute the requisite findings. Nonetheless, because we affirm the enhancement for obstruction of justice on other grounds, the failure of the district court to make more specific findings on perjury does not alter our decision.

Finally, Austin objects to the four-level enhancement for being the organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. U.S.S.G. § 3B1.1(a).[4] The district court applied the enhancement by finding that there were five people under Austin's control. Austin submits, however, that the government offered no proof that these people knowingly participated in the fraud scheme. While Austin admits that some of these people testified to having had "suspi-

---

4. The government argues that Austin failed to object to this enhancement at trial and that any error should be reviewed only for "clear error" under *Olano.* The record clearly reflects that Austin objected to this enhancement and that the district court overruled the objection.

cions" about the prints sold at Austin Galleries, he asserts that the government did not prove by a preponderance of the evidence that any of them were criminally responsible. *See United States v. Tai*, 41 F.3d 1170, 1174 (7th Cir.1994) ("*Tai II*"); *see also United States v. Cantero*, 995 F.2d 1407, 1413 (7th Cir.1993).

■ On this issue we agree with Austin. The government argued at the sentencing hearing that Austin had led an organization that contained five or more persons. The government relied on evidence that a number of Austin's employees openly joked about the inauthenticity of the prints they were selling and that one employee continued working for Austin even after he had seen Austin change the numbers on a print. Yet of the four employees to whom the government referred at sentencing, none was prosecuted, and three had been assured by Austin that the works were genuine. This evidence does not establish that Austin led "five or more persons sharing criminal responsibility." *Tai II* at 1174. Indeed, the government itself seems to have abandoned this argument on appeal, focusing instead on whether the evidence showed that Austin's organization was "otherwise extensive."

■ Although there were insufficient findings that Austin led an organization of five or more persons, this may well be a case where the defendant's organization was "otherwise extensive." Application Note 3 to § 3B1.1 states: "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." *See also United States v. Mohammad*, 53 F.3d 1426, 1436–37 (7th Cir.1995) (three participants and a large number of outsiders warranted an enhancement); *United States v. Tai*, 994 F.2d 1204, 1212–13 ("*Tai I*"); *United States v. Miller*, 962 F.2d 739, 745 (7th Cir.1992) (noting that "there is no prescribed minimum number of persons needed to permit an enhancement under § 3B1.1. All that is required to find that a scheme is 'otherwise extensive' is that the defendant directed at least one criminal participant.") Austin had over thirty galleries and hundreds of employees at his disposal to help him defraud the art-buying public; such facts certainly might lend themselves to an "otherwise extensive" finding.

The question is whether we can affirm on the basis of the "otherwise extensive" prong given the government's and the district court's exclusive focus at sentencing on the "five or more participants" prong. As in *Tai I*, the government here "insists that sufficient support for the increase can be found in the record," 994 F.2d at 1212, and asks us to affirm the sentencing enhancement on this alternate ground. But as we replied to that argument then, "it is not this court's role to make the factual findings necessary to support a sentencing calculation; that is a task for the district court." *Id.* The government contends that a remand on this issue would be a "useless, formalistic act." We find that contention somewhat inappropriate. Sentencing decisions, like most fact-sensitive inquiries, are best left to the trial court. There is no reason to depart from that general rule in the instant case.

For the foregoing reasons, we affirm Austin's conviction and the district court's sentencing determinations in all but one respect, vacate the district court's enhancement of Austin's sentence under U.S.S.G. § 3B1.1, and remand for resentencing on the § 3B1.1 issue only.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.