**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Donald AUSTIN, Defendant–Appellant.**

**No. 96–2618.**

United States Court of Appeals,
Seventh Circuit.

Submitted Dec. 10, 1996.[1]

Decided Jan. 8, 1997.

---

1. After an examination of the briefs and the record, we have concluded that oral argument is unnecessary, and the appeal is submitted on the briefs and the record. *See* Fed.R.App.P. 34(a); Cir.R. 34(f).

Barry Rand Elden, Chief of Appeals (submitted), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff-Appellee.

Matthew F. Kennelly, Cotsirilos, Stephenson, Tighe & Streicker, Chicago, IL, for Defendant-Appellant.

* The Honorable Barbara B. Crabb, of the United States District Court for the Western District of

Before FLAUM, EASTERBROOK, Circuit Judges, and CRABB, District Judge.*

FLAUM, Circuit Judge.

A federal jury convicted Austin in 1993 of selling counterfeit artwork. We affirmed the judgment of conviction and the district court's sentencing determination, with the exception of an enhancement imposed for Austin's alleged role as an "organizer or leader" of a criminal activity. *See United States v. Austin,* 54 F.3d 394 (7th Cir.1995). On that issue, because we agreed that the government had not established that Austin led five or more persons sharing criminal responsibility, we remanded to the district court with instructions to determine whether his criminal activity was "otherwise extensive" within the meaning of section 3B1.1(a) of the Sentencing Guidelines. *Id.* at 404–05. In this encore appeal, Austin argues that the district court erroneously resentenced him under the parameters laid down by this court and that the district court improperly denied his motion for a new trial based on newly discovered evidence. We affirm both the sentencing determination and the refusal to grant Austin a new trial.

### I.

■ We assume familiarity with the facts recited in the panel's original opinion and proceed directly to the issues presented in this appeal. We first address Austin's contention that the district court erred in denying his motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure—a ruling which we review for abuse of discretion. Austin's new evidence consists of statements made by government witnesses, either prior to or following Austin's trial, that allegedly undermine their trial testimony.

■ The district court found that Austin did not satisfy the requirements generally applied to Rule 33 motions based on newly discovered evidence: that the evidence (1)

Wisconsin, is sitting by designation.

came to light after trial; (2) could not with due diligence have been discovered earlier; (3) is material, and not merely impeaching or cumulative; and (4) would probably lead to an acquittal. *See United States v. Austin,* 929 F.Supp. 1110, 1113 (N.D.Ill.1996); *see also United States v. Reed,* 2 F.3d 1441, 1451 (7th Cir.1993). Austin argues that the district court applied the wrong test: because the newly discovered evidence revealed that Austin's conviction rested on "false" testimony, the district court should have evaluated this evidence under the more lenient test articulated as early as *Larrison v. United States,* 24 F.2d 82 (7th Cir.1928). The *Larrison* test, which applies in cases where the court is reasonably well satisfied that a material witness has testified falsely, demands only that a jury *might* have reached a different conclusion absent the false evidence and asks whether the party seeking the new trial either was surprised by and unable to meet the false testimony or did not learn of its falsity until after trial. *See United States v. Griffin,* 84 F.3d 912, 929 (7th Cir.1996); *Reed,* 2 F.3d at 1451; *United States v. Mazzanti,* 925 F.2d 1026, 1029 & n. 2 (7th Cir. 1991) (collecting cases critical of *Larrison* test). According to Austin, the district court's choice of the wrong test was an error of law that in itself constituted an abuse of discretion. Alternatively, Austin maintains that his new evidence meets the more stringent test applied by the district court.

■ The district court did not abuse its discretion by applying the "general" test for newly discovered evidence rather than the *Larrison* test. Although it is true as a general proposition that a district court's choice of an inappropriate legal standard constitutes an abuse of discretion, the *Larrison* test invests the district court with the responsibility for making the threshold factual determination that is a prerequisite to the test's application: the court must be "reasonably well satisfied" that there was false testimony. As Austin points out, the district court was aware of the *Larrison* test but instead applied the "general" test in denying his motion for a new trial. Implicit in the district court's choice of the proper test was the conclusion that Austin had not been convicted on the basis of false testimony, *see United*

*States v. Fruth,* 36 F.3d 649, 652 (7th Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1168, 130 L.Ed.2d 1122 (1995), and we cannot say that this conclusion was clearly erroneous. Indeed, it is a conclusion with which we wholeheartedly agree. Austin's "newly discovered evidence"-acontextual snippets of extrinsic testimony that, when paired with excerpts from extensive testimony delivered at Austin's trial, arguably yield minor contradictions with which a witness might have been impeached—does not give rise to the concerns of fairness and judicial integrity that arguably justify application of the *Larrison* test. Moreover, as we discuss briefly below, Austin can satisfy neither the test he advances nor the test applied by the district court.

■ This is especially true of the testimony of two of the government's expert witnesses, Field and Ewell. Austin argues that their earlier testimony in an unrelated federal prosecution (the "Center Art case") indicates that their testimony at Austin's trial was false. The weakness of this position becomes apparent if we assume for the moment that the experts' testimony in the *Center Art* case flatly contradicts their testimony at Austin's trial (a very tenuous assumption). Had Austin known of the earlier testimony prior to his own trial, he could have used the testimony in two ways: to impeach Ewell and Field, *see* Fed.R.Evid. 613, or, because it was given under oath at another trial, as substantive evidence, *see* Fed.R.Evid. 801(d)(1)(A). Yet impeachment evidence cannot provide the basis for a new trial. And if Austin intends to offer the newly discovered testimony as substantive evidence, he encounters a dilemma. The government does not have a monopoly on, or even special access to, art experts. If the experts' testimony at Austin's trial (as opposed to their *Center Art* testimony) was "false" (in the sense of being incorrect), Austin had the opportunity to offer his own experts regarding such matters as the meaning of "original lithograph" or Salvador Dali's activities during the 1980s. For this reason, Austin cannot demonstrate that his "new" evidence came to light after trial or that it could not with due diligence have been dis-

covered earlier. Nor can he succeed even under the *Larrison* test. "[T]he focus in the [*Larrison*] test is not on the newly discovered evidence, but on the false testimony itself." *Fruth*, 36 F.3d at 654. If Ewell's and Field's testimony was false, it is difficult to understand, given the availability of other experts, how Austin could have been unaware of its falsity or "surprised by and unable to meet" the testimony as *Larrison* and its progeny demand.

Turning to Coffaro, an art distributor who sold to other dealers and members of the public, we find little in the way of contradiction, let alone anything to suggest that his testimony at Austin's trial was false. After testifying at Austin's trial, Coffaro testified at the trial of family members of the art forger Leon Amiel. At the Amiel trial, Coffaro acknowledged that he had misled customers as to the authenticity of works he had purchased from Amiel. Austin argues that this subsequent testimony undermines Caffaro's testimony at Austin's trial suggesting that Austin knew he was purchasing Amiel-produced fakes from Caffaro. We agree with the government that, read in context, this general admission to defrauding the public does little to contradict Caffaro's more specific testimony regarding Austin's state of mind. In fact, the thrust of Caffaro's testimony at Austin's trial was not that Caffaro had expressly informed Austin that the Amiel prints were forgeries, but rather that Austin's behavior was consistent with knowledge that he was dealing in counterfeit works. Caffaro's testimony offered the jury an array of conduct from which it could have concluded that Austin knew he was selling forgeries: Austin asked for authentication of prints to "cover his ass"; he accepted unsigned documentation concocted out of whole cloth by Caffaro and Amiel; he obtained prints in quantities grossly exceeding the number in which they should have been available; he continued to purchase from Caffaro after receiving prints of such poor quality as to suggest that they were not authentic; he obtained prints at prices well below the market rate; and, after being raided by the FTC, he attempted to sell crude forgeries to Caffaro. Also at Austin's trial, Caffaro acknowledged that he had pleaded guilty to mail fraud in connection with his own art dealings. That Caffaro had lied to the art-buying public was hardly a revelation. It certainly does not entitle Austin to a new trial.

Austin's last piece of "new evidence" is the supposed existence of a promise of leniency made by the FTC to Robert Galitz, a government witness and former Austin employee, in the course of the FTC's initial investigation of Austin. At the resentencing hearing, Galitz testified that, although he had concerns stemming from his involvement with Austin, he did not fear that he would be targeted by investigators. He explained, "I think it was inferred, not said, that as long as I was cooperating, that myself or other employees weren't of interest." Austin argues that, because the FTC investigation of Austin was integral to his subsequent prosecution, the government's failure to disclose this "promise" violated its duties under *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). We do not believe that Galitz's testimony, read as a whole, reveals the existence of a promise, either implicit or explicit, of favorable treatment in return for cooperation. In fact, Galitz offered the statement we have just quoted, and upon which Austin places much reliance, as an explanation of why Galitz did not believe that federal investigators "might turn their attention to" him. Shortly thereafter, when defense counsel specifically asked Galitz if "the reason you weren't worried anymore is that it had been inferred to you at some point that as long as you continue to cooperate, they weren't interested in you," Galitz was unequivocal: "No," he responded, "it's because all of the people were involved, I was certain that I wasn't one out of many that were going to have a problem." Fairly read, Galitz's testimony recounts his subjective understanding that the government was not targeting Austin's many employees and that Galitz had nothing to fear so long as he did not impede the investigation. Despite counsel's vigorous efforts to elicit a more damning statement from Galitz, Austin has uncovered nothing that would entitle him to a new trial.

█ We have considered each piece of Austin's "new evidence" in isolation in order

to demonstrate that none of it is significant and that certainly none of it suggests that witnesses testified falsely at Austin's trial. We pause only to add that even if some of Austin's proffered evidence were material and newly discovered, it would not entitle him to a new trial. In order to win a new trial, Austin had to demonstrate that the introduction of the new evidence probably would have altered the outcome of his trial. Yet in our first opinion in this case, we remarked upon "the overwhelming weight of the case against Austin," 54 F.3d at 401, a case that included Austin's signed admission to fraud made in settlement of the FTC investigation. Given the abundance of evidence demonstrating Austin's criminal intent, we do not believe that the evidence he has unearthed would have resulted in acquittal. In short, the district court did not abuse its discretion in denying Austin a new trial.

## II.

■ We now turn to the issue upon which we remanded this case. On remand, the district court found that Austin's criminal activities were "otherwise extensive" and that his sentence therefore could be enhanced based upon his role as an organizer or leader. *See* 929 F.Supp. at 1111–13. As a prerequisite to its finding that Austin's criminal conduct was otherwise extensive under section 3B1.1(a), the district court was required to find that Austin supervised at least one participant sharing criminal responsibility. *See United States v. Miller*, 962 F.2d 739, 745 (7th Cir.1992); *United States v. Hernandez*, 931 F.2d 16, 18 (7th Cir.1991) (discussing *United States v. Tetzlaff*, 896 F.2d 1071 (7th Cir.1990)).[2] The court determined that there were two eligible candidates for the role of participant: Galitz and another former Austin employee, Ronald Hunter. Austin argues that neither Galitz's trial testimony nor his testimony at the resentencing hearing supports the court's finding that Gal-

itz shared criminal responsibility. Similarly, he contends that Hunter's deposition, introduced at trial, does not demonstrate that Hunter knowingly defrauded customers. Austin also objects to the court's reliance upon a post-trial hearsay statement made by Hunter to a postal inspector prior to resentencing.

■ We limit our review of the district court's determination that Galitz and Hunter were participants to asking whether this determination was clearly erroneous. *See Miller*, 962 F.2d at 745; *Hernandez*, 931 F.2d at 17. We conclude that it was not. In reaching its finding with respect to Galitz, the district court noted that Galitz worked for Austin for twelve years and rose to the position of vice-president of operations, that it was Galitz's responsibility to pacify customers who called to complain about the authenticity of works they had purchased from Austin—an increasingly frequent occurrence near the end of Galitz's tenure—, and that Galitz admitted at the resentencing hearing to facilitating sales even after he realized that the works were not authentic. Based on Galitz's testimony, the district court ruled that "the government has proved by a preponderance that Galitz intentionally defrauded the complaining customers by concealing and omitting material facts . . . or, at the least, Galitz consciously avoided guilty knowledge even though he harbored serious suspicions." 929 F.Supp. at 1112. Our review of the record reveals ample support for the district court's conclusions. Austin essentially takes issue with the district court's view of the evidence. Yet our remand was premised on the understanding that "[s]entencing decisions, like most fact-sensitive inquiries, are best left to the trial court." 54 F.3d at 405. Because the court's finding that Galitz was a participant was not clearly erroneous, and because one participant was a sufficient predicate to the finding that Austin's criminal

---

**2.** Because, on remand, the question whether Austin's criminal activity was otherwise extensive did not turn upon a "head count," but rather upon whether there was a single participant sharing the requisite criminal intent, this case does not implicate the holding of *United States v. Tai*, 41 F.3d 1170, 1175 (7th Cir.1994), that "[i]f a district court intends to rely solely upon the

involvement of a given number of individuals to support a determination that criminal activity is 'otherwise extensive,' it must point to some combination of participants and outsiders equaling a number greater than five." *See Austin*, 54 F.3d at 405 ("Austin had over thirty galleries and hundreds of employees at his disposal to help him defraud the art-buying public. . . .").

conduct was otherwise extensive, we need not address Austin's complaints regarding the district court's treatment of Hunter's statements.

The judgment of the district court is AF-FIRMED.