**UNITED STATES of America, Plaintiff,**

v.

**CHEMICALS FOR RESEARCH AND INDUSTRY, Defendant.**

No. C 96–2382 SI.

United States District Court,
N.D. California.

June 12, 1998.

Mark T. Quinlivan, U.S. Department of Justice, Civil Division, Washington, DC, for Plaintiff.

Marcus S. Topel, Topel & Goodman, San Francisco, CA, for Defendant.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUPPLEMENTAL PRELIMINARY INJUNCTION

ILLSTON, District Judge.

On February 25, 1998, the Court heard argument on plaintiff's motion for a supplemental preliminary judgment. Having considered the arguments of counsel and the papers submitted, the Court hereby GRANTS plaintiff's motion as follows:

### BACKGROUND

Defendant Chemicals for Research and Industry ("CFRI"), a chemical and laboratory supply company located in Oakland, California, has had a long and antagonistic relationship with the United States Department of Justice ("DOJ") and Drug Enforcement Administration (DEA) (collectively "the government"). In the early 1990's, CFRI filed two actions based on the government's attempts to limit CFRI's sales of chemicals to individuals using the chemicals to manufacture methamphetamine. First, in *CFRI v. Thornburgh*, 762 F.Supp. 1394 (N.D.Cal.1991), the district court issued a preliminary injunction against the government, enjoining the government from notifying chemical suppliers that they should refrain from selling certain chemicals to CFRI. The government's agents had "suspect[ed] that chemicals sold by plaintiff have been diverted to use at illegal methamphetamine manufacturing laboratories." 762 F.Supp. at 1395. The case later settled.

Second, in *CFRI v. Reno*, C 93–1041 CAL (N.D.Cal.1993), CFRI challenged the DEA's practice of stopping vehicles registered to individuals after the vehicles had stopped at CFRI. The Court agreed that CFRI and its customers would likely prevail on its claims that their Fourth and Fifth Amendment rights had been violated, and issued another preliminary injunction in favor of CFRI. The court noted in issuing its decision that it considered it "significant that there has been no charge here that CFRI has been violating any drug law . . . ." May 7, 1993 Hearing on CFRI's Motion for a Preliminary Injunction at 22. The case later settled.

On July 1, 1996, the government began the present action, alleging that CFRI had violated the Controlled Substances Act, 21 U.S.C. § 801, *et seq.* (the "Act"), as amended by the Chemical Diversion and Trafficking Act of 1988, and sought declaratory relief, preliminary and permanent injunctive relief, and civil penalties, based on CFRI's "failure to report 4042 suspicious purchases of listed chemicals as required by the Act, its failure to make 24 reports of suspicious purchases of listed chemicals at the earliest practicable opportunity . . . and its failure in 99 instances to maintain adequate records as required by the Act and the CDTA's implementing regulations." Complaint ¶ 1.[1]

On November 26, 1996, the Court enjoined defendant Chemicals for Research and Industry (CFRI) "from failing to report" to the

---

1. Specifically, the government brought the action under 21 U.S.C. § 842(a)(10), which makes it unlawful for any person "to fail to keep a record or make a report under section 830 of this title."

Section 830, inter alia, requires "regulated person[s]" to record certain transactions in "listed" chemicals. *See* 21 U.S.C. § 830(a) and (b).

DEA sales of ethyl ether when (1) the sales are made to individual purchasers not connected with a business entity; or (2) the sales are made by cash or a combination of cash and cashiers' checks or cash and money orders; or (3) the sales are made in conjunction with other chemicals commonly used with ethyl ether in the illicit manufacture of PCP, including bromobenzene, petroleum ether, magnesium turnings, iodine crystals, cyclohexanone, pyridine, hydrochloric acid, sodium bisulfite or metabisulfite, phenyl magnesium bromide, sodium hydroxide, or metal catalysts (including palladium, palladium-on-crabon, ruthenium, or ruthenium dioxide).

Meanwhile, Congress enacted the Comprehensive Methamphetamine Control Act of 1996 (CMCA). The CMCA named iodine and hydrochloric gas as "list II" chemicals: chemicals "specified by regulation of the Attorney General as a chemical that is used in manufacturing a controlled substance....." 21 U.S.C. § 802(35)(I)–(J). The CMCA also makes it "unlawful" "to distribute a laboratory supply to a person who uses, or attempts to use, that laboratory supply to manufacture a controlled substance or a listed chemical, in violation of this subchapter or subchapter II of this chapter, with reckless disregard for the illegal uses to which such a laboratory supply will be put." 21 U.S.C. § 842(a)(11).[2] Finally, the CMCA explicitly authorizes the Attorney General to "commence a civil action for appropriate declaratory or injunctive relief relating to violations of [21 U.S.C. § 843] or [21 U.S.C. § 842]." 21 U.S.C. § 843(f) ("Injunctions").

On February 18, 1997, the government filed a first amended complaint for reporting violations.

Then, on November 14, 1997, the government filed concurrently a motion to file a "second supplemental complaint" and the present motion for a supplemental preliminary injunction.

On February 2, 1998, the Court granted the government's motion to file its supplemental complaint. That complaint included four new counts: one brought under 21 U.S.C. § 842(a)(11), and three brought under 21 U.S.C. § 843(a)(7). 21 U.S.C. § 843(a)(7) makes it "unlawful" "to ... distribute ... any equipment, chemical, product, or material which may be used to manufacture a controlled substance or listed chemical, knowing, intending, or having reasonable cause to believe, that it will be used to manufacture a controlled substance or listed chemical in violation of this subchapter or subchapter II of this chapter...."

The count brought under 21 U.S.C. § 842(a)(11) concerns CFRI's alleged sales of iodine, red phosphorous, HCL gas, and/or Freon. The counts brought under 21 U.S.C. § 843(a)(7) concern CFRI's alleged sales of, respectively, (1) iodine, red phosphorous, and HCL gas; (2) Freon or a combination of Freon and sodium hydroxide; and (3) PCP precursor chemicals (ethyl ether, bromobenzene, magnesium turnings, iodine crystals, cyclohexanone, and sodium metabisulfite).

In the present motion for a preliminary injunction, the government asks the Court to enter an injunction enjoining CFRI from engaging in any further sales of iodine, red phosphorous, HCL gas, Freon, and sodium hydroxide, as well as the PCP precursor chemicals listed in the Court's first preliminary injunction.

## LEGAL STANDARD

The moving party is entitled to a preliminary injunction if it establishes either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that there exist serious questions regarding the merits and the balance of hardships tips sharply in its favor. *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir.1987); *California Cooler v. Loretto Winery*, 774 F.2d 1451, 1455 (9th Cir.1985); *see also Wm. Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 526 F.2d 86, 88 (9th Cir.1975).

The test is a "continuum in which the required showing of harm varies inversely with the required showing of meritoriousness." *Rodeo Collection*, 812 F.2d at 1217 (quoting *San Diego Comm. Against Regis-*

---

**2.** 21 U.S.C. § 842(a) defines "laboratory supply" as "a listed chemical or any chemical, substance, or item on a special surveillance list published by the Attorney General...."

*tration and the Draft v. Governing Board of Grossmont Union High School Dist.,* 790 F.2d 1471, 1473 n. 3 (9th Cir.1986)). To overcome a weak showing of merit, a plaintiff seeking a preliminary injunction must make a very strong showing that the balance of hardships is in its favor. *Rodeo Collection,* 812 F.2d at 1217.

■ Where, as here, injunctive relief is authorized by statute, *see* 21 U.S.C. § 843(f), and the statutory conditions are satisfied, "the agency to whom the enforcement of the right has been entrusted is not required to show irreparable injury." *United States v. Odessa Union Warehouse Co-op,* 833 F.2d 172, 175 (9th Cir.1987). "No specific or immediate showing of the precise way in which violation of the law will result in public harm is required." *Id.* Instead, the district court is to "presume[ ] that the government would suffer irreparable harm." *Id.* at 175–76.

## DISCUSSION

### A. "Reasonable cause to believe"

■ As an initial matter, the parties dispute the meaning of the scienter requirement in 21 U.S.C. § 843(a)(7)—*"knowing, intending, or having reasonable cause to believe* that [a chemical] will be used to manufacture a controlled substance." (emphasis added). Defendant argues that the language "reasonable cause to believe" "connotes a scienter requirement of willful blindness." Opposition at 5. The government disagrees. It contends that "reasonable cause to believe" is defined by its terms only, and that "willful blindness" is a separate scienter requirement associated with an alternative showing of "knowledge." Reply at 3.

The Court agrees with the government on this point, and will consider the likelihood of success on the merits of the government's claims under 21 U.S.C. § 843(a)(7) by considering whether CFRI or its agents has had "reasonable cause to believe" that the chemicals it sells will be used to manufacture methamphetamine or PCP. *See* Ninth Circuit Manual of Model Jury Instructions—Criminal § 9.4.18 (1997 ed.) (instruction for 21 U.S.C. § 841(d)(2)'s statutory language "knowing, or having reasonable cause to believe" is "knowing, or having reasonable cause to believe"); *United States v.*

*Anderson,* 61 F.3d 1290, 1295 (7th Cir.), *cert. denied,* 516 U.S. 1000, 116 S.Ct. 543, 133 L.Ed.2d 446 (1995) (same interpretation of 21 U.S.C. § 841(d)(2)).

The only case cited by defendant to support its conclusion that "reasonable cause to believe" in fact means "willful blindness" is inapposite. In *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.,* 955 F.2d 1143, 1149 (7th Cir.1992), the Seventh Circuit approached the issue of vicarious liability in a trademark case when the defendant is not a manufacturer or distributor. While a finding of "willful blindness" would satisfy the scienter requirement "knows or has reason to know," the Seventh Circuit concluded, a finding of simple negligence would not. *See* 955 F.2d at 1149. The opinion does not "construe" "reason to know" (much less "reasonable cause to believe") to mean willful blindness, as CFRI contends, but rather indicates that the standard falls somewhere between the scienter requirements of negligence and knowledge.

### B. The Evidence

The government argues that it is likely to succeed on the merits of its allegations against CFRI: that (1) CFRI has knowingly or intentionally distributed chemicals which may be used to manufacture methamphetamine and PCP, knowing, intending, or having reasonable cause to believe that the chemicals will be used to manufacture methamphetamine and PCP; (2) CFRI has distributed two "listed" chemicals—iodine and hydrochloric gas—to a person who uses, or attempts to use these chemicals to manufacture methamphetamine; and that (3) CFRI has failed to keep records and reports of these and other transactions pursuant to 21 U.S.C. § 842(a)(10).

The government has provided the Court with evidence of four different "sets" of alleged violations. The first set involves CFRI's sales in combination of iodine, red phosphorous, and HCL gas. The second set involves sales of these chemicals to a single customer. The third set involves sales of Freon or a combination of Freon and sodium hydroxide. And the fourth set involves of PCP precursor chemicals.

The government argues that 102 sales by CFRI of iodine, red phosphorous, and HCL in particular suggest that CFRI has had reasonable cause to believe that these chemicals were being diverted to methamphetamine production. The sales involved different combinations of the above chemicals (e.g., iodine crystals and red phosphorous, or iodine and HCL gas, or iodine and HCL gas and red phosphorous). *See* Exhibit 1 to the Fourth Declaration of Thomas Kivley. In all of the 102 sales, the individual purchaser paid in cash, and was not affiliated with any business entity. *See id.* The amounts of cash that changed hands was often rather large: for example, on December 3rd, 1996, an individual paid $3924.04 in cash to CFRI for 2.5 kgs of iodine crystals, 60 lbs. of HCL gas, 1 kg of red phosphorous, 57 liters of Freon, and 19 liters of trichlorethane. *See id.* at 11. On April 25th, 1997, an individual paid $3852.62 in cash to CFRI for 12 kgs of iodine crude, 100 lbs of red phosphorous, 2 complete glassware set-ups, and "surplus equipment." *See id.* at 3. And on May 15, 1997, an individual paid $9366.87 in cash to CFRI for 25 lbs. of iodine crystals, 5 kg of red phosphorous, 171 liters of Freon, and 100 lbs of sodium hydroxide. *See id.*

The government contends that such cash sales to individuals rather than businesses are not only suspicious because of the large amounts of cash involved, but also because of the chemicals involved: both iodine and HCL gas are "listed" in the Act, which means that they are recognized to be "used in manufacturing a controlled substance in violation of [the Act]." 21 U.S.C. § 802(35). The government also argues that CFRI has had "reasonable cause to believe" that such chemicals are being used to manufacture methamphetamine because the government said as much in a February 28, 1997 letter related to settlement discussions. Also, and perhaps most importantly, the government has submitted the declaration of a DEA forensic chemist, Harry Skinner, to the effect that "purchases of combinations of iodine, red phosphorous, HCL gas, Freon and/or sodium hydroxide to individual purchasers who are not connected with a business or commercial entity, particularly those made for large amounts of cash or cash equivalents, will, in almost all cases, be diverted for use in the clandestine manufac-

ture of methamphetamine. Indeed, it is my experience that there is virtually no legitimate use for the chemicals, in any set of combinations, but to manufacture methamphetamine." Declaration of Harry F. Skinner ¶ 5. "The use of these chemicals for this purpose is well known in the chemical industry generally." *Id.* ¶ 4.

Notably, defendant CFRI does not suggest any alternative uses for these combinations of chemicals. Instead CFRI argues that the DEA "seeks to impose its cynical and biased world-view" on CFRI. Opposition at 1. CFRI first attempts to diminish the evidentiary value of "listing" chemicals. Second, CFRI argues, in apparent contradiction, that Mr. Skinner is a "lay witness" pursuant to Federal Rule of Evidence 701 but also that Mr. Skinner's declaration "exemplifies the government's insensitivity to the differences between what is known by its career investigators and what is known by ordinary persons who sell chemicals." Opposition at 10. Third, CFRI attacks the government's February 28, 1997 letter as inadmissible pursuant to Federal Rule of Evidence 408, or alternatively taken out of context by the government. Finally, CFRI contends that it is sufficiently careful about cash transactions because it requires a driver's license and license plate number for sales over $100, and that in any event it has a duty to accept cash.

■ The Court concludes that CFRI's evidentiary objections fail. The government is using statements from its February 28, 1998 settlement letter as evidence of notice and not "to prove liability . . . for the claim." As such, the evidence is admissible. *See United States v. Austin,* 54 F.3d 394, 400 (7th Cir.1995). Mr. Skinner, with at least 20 years of professional experience and 300 appearances as an expert witness under his belt, *see* Skinner Dec. ¶ 3, qualifies as an expert under Federal Rule of Evidence 702 and his opinion as to the uses of the chemicals sold by CFRI is properly before the Court.

■ The Court is also convinced it is likely that CFRI had reasonable cause to believe that the above purchases were made in order to manufacture methamphetamine. The Court reaches the same conclusion with re-

gard to the remaining three sets of transactions: eight sales of iodine, red phosphorous, HCL gas and/or Freon to a single customer over a two-month period; 197 sales of Freon or Freon and sodium hydroxide averaging over $6000 in cash or a combination of cash and money orders or cash and checks; and 12 sales of PCP precursor chemicals (ethyl ether, bromobenzene, magnesium turnings, iodine crystals, cyclohexanone, and sodium metabisulfite).[3] The Court relies on the government's evidence that the above transactions were made for often large amounts of cash, between CFRI and individuals on a will-call basis, and involving chemicals closely associated with methamphetamine production in combinations that strongly suggest illegal use.

## C. Conclusion

The Court therefore concludes that an injunction is necessary. Plaintiff has demonstrated a likelihood of success on the merits of its claim that defendant CFRI has violated the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, as amended by the Chemical Diversion and Trafficking Act of 1988 and the Comprehensive Methamphetamine Control Act of 1996, by "distribut[ing] ... any equipment, chemical, product or material ... which may be used to manufacture [methamphetamine or PCP] ... knowing, intending, or having reasonable cause to believe, that it will be used to manufacture [methamphetamine or PCP]," 21 U.S.C. § 843(a)(7), and by "distribut[ing] a laboratory supply to a person who uses, or attempts to use, that laboratory supply to manufacture [methamphetamine or PCP] ... with reckless disregard for the illegal uses to which such a laboratory supply will be put," 21 U.S.C. § 842. The Court notes that 21 U.S.C. § 843(f) explicitly provides for such injunctive relief.

The Court also notes that, even if it were to conclude that plaintiff's likelihood of success was too speculative to grant an injunction, it would nonetheless grant the preliminary injunction based on the serious questions regarding the merits raised by the government and the fact that, in light of the minimal burdens of the following injunction, the balance of hardships clearly is far more heavily weighted on the government.

It is therefore **ORDERED** that, pending further order of this Court, defendant CFRI is hereby enjoined from selling the following chemicals, under the following circumstances:

(1) Any and all sales of ethyl ether, iodine, or hydrogen chlorine gas:

a) made to individual purchasers not connected with a business entity; or

b) made by means of cash, cashiers' checks, money orders; or combinations thereof.

(2) Any and all sales of sodium hydroxide; Freon; hydrochloric acid; petroleum ether; sodium bisulfite or metabisulfite; red phosphorous; bromobenzene; cyclohexanone; iodine crystals; hydriotic acid; magnesium turnings; pyridine; phenyl magnesium bromide; palladium; paladium-on-carbon; ruthenium; or ruthenium dioxide:

a) made by means of cash, cashiers' checks, money orders, or combinations thereof, unless the amount of the purchase is less than $100.00.

The Court concludes that the above injunction is "tailored to restrain violations of" 21 U.S.C. §§ 842 and 843.

**IT IS SO ORDERED.**

---

3. As with the sales of iodine, red phosphorous, HCL gas, Freon and sodium hydroxide, the Court finds Mr. Skinner's declaration helpful in evaluating whether sales of these PCP precursor chemicals could have been recognized as such. "[I]t is my experience, in more than 20 years as a Forensic Chemist with the DEA, that purchases of combinations of ethyl ether, bromobenzene, magnesium turnings, iodine crystals, cyclohexanone and/or sodium metabisulfite to individual purchasers who are not connected with a business or commercial entity, particularly those made for large amounts of cash or cash equivalents, will, in almost all cases, be diverted for use in the clandestine manufacture of PCP. Indeed, it is my experience that these is virtually no legitimate use for these chemicals, in any set of combinations, but to manufacture PCP." Skinner Dec. ¶ 7. "The use of these chemicals for this purpose is well known in the chemical industry generally." *Id.* ¶ 6.